## THE SACKETTS HARBOR BANK *v.* ROBERT CODD.

The statute in relation to foreign bank notes (*ch.* 223 *of* 1853) does not prohibit banks or individual bankers from selling or delivering such notes for any purpose, except for circulation as money, within this state.

It is no offence for a bank or banker, having lawfully taken such notes at par, to sell them to another bank or banker at any rate of discount, providing the transfer be not with a view to their circulation in this state. The prohibition is only upon the bank or banker buying at a greater than the legal discount.

Accordingly, when one bank drew a bill of exchange in favor of another bank, in payment of foreign bank bills, purchased by the latter at more than legal discount, for the purpose of sending them home for redemption, *Held,* that this was no defence to an action upon the bill of exchange.

The contract not being void as against the seller, and the security not being of a prohibited character, there is nothing which the seller is required to disaffirm. He may recover upon the instrument itself, and is not obliged to go upon an implied assumpsit for the value of the bills sold.

APPEAL 'from the Supreme Court. Action against the defendant as the drawer of two bills of exchange, drawn on Duncan, Sherman & Co., of New York, and protested for non-payment. The plaintiff was an incorporated (safety fund) bank, located at Buffalo, and the defendant an individual banker under the general banking law, carrying on the business at the same place under the name of the Exchange Bank of Buffalo. The defence was, that the consideration of the bills of exchange was the sale by the plaintiff to the defendant of circulating notes of Canadian banks at a greater discount than that authorized by the statute (*ch.* 223 *of* 1853) in relation to foreign bank notes. The facts proved on the trial before Mr. Justice GREENE, at the Erie Circuit, are sufficiently stated in the following opinion. The defendant requested the judge to charge that the plaintiff, an incorporated bank, had no right to utter foreign bank bills below par within this state, and that so doing was in violation of the statute. The judge refused so to charge and the defendant excepted. He also requested the judge to charge that

the defendant as an individual banker had no right to take or receive foreign bank bills at a greater rate of discount than one-quarter of one per cent, (which was the rate fixed by law, at the time of the transaction, for the redemption of the bills of the banks of this state at their agencies) within this state. The judge refused so to charge and the defendant took an exception.

The plaintiff had a verdict and judgment. The exceptions taken to the judge's charge were, upon appeal, argued at general term in the eighth district, where the judgment was affirmed. The defendant appealed to this court. The case was submitted on printed arguments.

*A. P. Laning*, for the appellant.

*Sherman S. Rogers*, for the respondent.

COMSTOCK, J. The defendant, an individual banker under the general banking act of 1838, received from the plaintiff, an incorporated bank, two sums in Canada bank bills, one, of $3,400, on the 3d of November, 1854, at a discount of one-quarter of one per cent, and one three days afterwards of $1,700 at a discount exceeding that rate by a very minute fraction. In both instances the bills were received for the purpose of sending them to Canada for redemption, and this object was known to the plaintiff. At the time of each transaction the defendant gave a check on himself for the price of the bills, and the checks, soon after they were given, were exchanged for the drafts of the defendant on which this suit was brought. The payment of both drafts is resisted, on the ground that the transactions were in violation of the statute of April, 13, 1853, concerning "foreign bank notes."

A minute statement of the provisions of that statute is unnecessary for the purpose of determining the present question. In substance and effect it prohibits banks and

bankers from receiving foreign bank notes at a rate of discount exceeding one-quarter of one per cent, and from uttering them for circulation as money within this state. Private persons, not bankers, are also forbidden to utter them for circulation, provided they received them at a greater rate of discount than a quarter of one per cent. What the act *does not* contain is quite as material to be stated. There is no prohibition upon banks or bankers against receiving such notes at par, or at a quarter per cent less than par, nor upon banks, bankers or strictly private persons from selling or uttering them for any purpose except circulation as money within this state. For aught that appears in this case, the plaintiff's bank had received the notes in question at par. There is certainly no pretence that it received them at a prohibited rate of discount, or that it delivered them to the defendant for the purpose of circulating, or in any manner aiding their circulation. In respect to the sum first received, therefore, there was plainly no violation of the statute on the part of any one. In respect to the other sum, the defendant took the bills at a prohibited discount, unless, indeed, by the true construction of a particular clause in the first section of the statute, they could be lawfully delivered and received at any discount agreed on by the parties, provided the plaintiff had originally taken them at par. I do not insist upon that construction, although there is no small difficulty in holding otherwise, upon the language used. Conceding that the statute was violated, the material questions are, who were in fact and in judgment of law the guilty parties, and what are the consequences upon the rights of the plaintiff?

When a bank becomes, as it may, and as the plaintiff in fact became, the lawful holder of foreign bank notes, it holds them with the same rights which would, in the like case, belong to any citizen of the state. It may use them in any way not prohibited by law. It may send them home for redemption, and it may sell and deliver them for any

purpose except circulation as money within this state. It may also, if a private person can, sell them at any rate of discount to an individual, not a banker; and it may do so to a bank or banker, unless the prohibition against *receiving* such notes at more than a quarter of one per cent discount must in all cases be deemed to include also the bank or the private person selling and delivering them. We are brought, therefore, to the inquiry whether a private citizen, lawfully holding a foreign bank note, and paying or delivering it to a bank or banker within this state, not intending it to go into circulation, but with the expectation and understanding that it is to be sent to the maker for redemption, is to be deemed an offender against this statute, on the ground that the receiving bank exacts of him a greater discount than it is allowed to take. This, I say, is the question, because the plaintiff's bank held the notes which it delivered to the defendant under no prohibition or disqualification which is not equally applicable to every citizen.

Let us then suppose that a private person, lawfully holding $1,000 of foreign bank bills, deposits them in the bank where his account is kept, and has a credit for the amount, less one-half of one per cent, and that the bank, pursuant to a practice known to its customer, sends them to the maker for redemption. The receiving bank, I assume, violates the statute because it exacts a greater discount than it is allowed to take. But is the customer also guilty? The answer to the question is plain. The statute declares it to be unlawful for a bank or banker to *receive* foreign notes at greater rates, &c., and it prescribes a penalty of $1,000 for each offence. (*Stat. of* 1853, *ch.* 223, § 4; *Stat. of* 1839, *ch.* 355, § 4.) The language in which the offence is defined and the penalty declared, evidently does not include the customer making the deposit or delivering the notes. No degree of guilt, therefore, attaches in such a case to any one except the corporation and its agents, or the individual banker, receiving the notes at the prohibited rate of dis-

count.   The act, it must be borne in mind, involves in itself no moral turpitude.   It is an offence, because the statute declares it to be so, and for that reason alone.   It is an offence, therefore, which has precisely the proportions the statute gives to it, and it can have no other or greater. The offence and the offender are both marked by the legislature, and the penalty is prescribed.   The case of *Tracy* v. *Talmage* (14 *N. Y.*, 162) involved a question entirely similar.   In that case, the North American Trust and Banking Company had issued certain time paper, which, as this court then assumed, it had no power to issue, and from issuing which it was prohibited under a penalty.   The paper was issued in payment for state stocks purchased by the bank.   It was held that the bank was the sole offending party, the statute, as was said, having marked the criminal, and that the vendor of the stocks could recover their value.   No case ever received a more careful consideration in this court, and the principles there laid down are with us no longer open to discussion.   They were adopted in the fullest manner in the still later case of *Curtis* v. *Leavitt* (15 *N. Y. Rep.*, 9).

In *Tracy* v. *Talmage*, it was held that the vendor of the stocks might recover the sum they were reasonably worth as on a disaffirmance of the supposed illegal contract.   The sale of the stocks and the agreement to pay therefor were held to be a lawful contract, so that there was nothing to disaffirm except the post-notes taken for the price.   We might, therefore, upon the general principles established by the decision, have determined that the vendor could recover the price specifically which had been agreed on between the parties to the sale, thus ignoring simply the prohibited instruments, and leaving the transaction to stand in favor of the innocent party in all other particulars.   The value of the stocks and the price agreed on not being supposed to differ, it was not important to the vendor whether he recovered the price upon the contract or the reasonable value on

the theory of a disaffirmance. He held no collateral securities which would be endangered or lost by such disaffirmance.

We took the additional step of sustaining a similar contract in all its parts, except the condemned security, in the other case mentioned— *Curtis* v. *Leavitt.* In one branch of that case it appeared that two banks in Philadelphia had loaned the same company above mentioned the sum of $250,000, to be repaid at certain periods specified, and for the several installments the post notes of the company were taken. These notes were supposed to fall within the prohibition of the act of May 14th, 1840, against time paper, and it was assumed that they were void. But collateral securities were at the same time pledged to the lenders, and if the whole contract was illegal or was disaffirmed, the title to those securities would be lost, and they were in fact claimed by the receiver of the company for the benefit of other creditors. It was the collateral securities alone which rendered that large debt of any value. In passing upon this branch of the case, we followed and approved, as already observed, the general doctrines established in *Tracy* v. *Talmage* (*supra*), holding consequently that the lenders were not partakers in the offence committed by the borrowing bank in issuing its post-notes, and therefore that the law did not leave them without remedy. But the question sharply arose, whether the remedy was confined to a disaffirmance of the whole contract, in other words simply to an implied assumpsit for money had and received—a remedy which would leave the lenders without the securities pledged. That question was examined upon principle and authority, and this court determined that the contract was valid in all its parts except the prohibited post-notes. This conclusion sustained the loan, the obligation to repay at the times agreed on, and the pledge of the collateral securities. It was a conclusion which rested upon the great and conservative principle, that where the good is mixed with the bad.

or, more properly speaking, the valid with the void, in the contracts and dealings of men, the good and valid shall stand, provided the separation can be made. The exceptions recognized were, first, where a statute, by its express terms, declares the whole deed or contract void on account of some provision which is unlawful; and second, where there is some all-pervading vice, such as fraud, for example, which is condemned by the common law, and avoids all parts of the transaction, because all are alike infected. (15 *N. Y. Rep.*, 91 — 101.)    The post-notes were therefore assumed to be invalid, because the corporation was prohibited under a penalty from issuing them.    But in respect to the innocent party, this was regarded as a voidness merely, and not as a contamination infecting an entire contract which was in all other particulars lawful.

The principles so carefully considered and laid down in *Tracy* v. *Talmage*, and carried to their just result in *Curtis* v. *Leavitt*, are, I think, decisive of the present case.    It was lawful for the plaintiff to sell and for the defendant to buy the Canada notes.    The defendant, in exacting too high a rate of discount, was a public offender.    But the offence was strictly statutory.    It resided in the act of taking the notes at the prohibited rate, and the criminality rested on him alone.    So, also, does the punishment.    The plaintiff has forfeited nothing, because the law does not adjudge him to be a sharer in the guilt.    What, then, is the remedy?    So far as I can see, he is not obliged to disaffirm anything. The statute does not declare the contract to be void, nor is the action brought upon any prohibited instrument.    The drafts in suit were given for the price of the notes, and both in form and substance they are lawful instruments. A banker, in dealing with others, may exact terms which the law for good reasons declares it unlawful for him to exact; but in my judgment it is not opposed to the logic, as it certainly is not to the morality, of the law, to hold that he shall be bound by a fair obligation which he assumes in the

The Sacketts Harbor Bank *v.* Codd.

course of that dealing. On the contrary, the great principles of justice, not less than of policy, on which the law is founded, demand that he shall be bound. If, as the evidence of the obligation, he issues an instrument which in terms he is prohibited from issuing, it may be that a technical logic will prevent a recovery on that instrument. In such a case, it may be necessary to disaffirm so much of the contract, but nothing more. This is not such a case. The defendant was bound to pay for the notes which he received, and the drafts given for the price are instruments which he was not forbidden to make. Even if we adopt the theory that only the simple value of the notes can be recovered, in disaffirmance of all the express terms of the contract, the result will not be changed. There is no proof or suggestion that the notes were not worth the price agreed on, and we must, therefore, presume that they were. The drafts subsequently given are then to be regarded as covering that value, and (besides being lawful in form) they are supported by that consideration.

The judgment must be affirmed.

JOHNSON, Ch. J., HARRIS, PRATT and ROOSEVELT, Js., concurred; SELDEN, J. dissented on the ground that although the plaintiff was entitled to recover the value of the bills as upon an implied assumpsit, the contract itself could not be set up as establishing that value. DENIO and STRONG, Js., also dissented.

Judgment affirmed.