## Case No. 7,238.

In re JAYCOX et al.

[13 Blatchf. 70.] [1]

Circuit Court, N. D. New York. July 1, 1875.

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

George Doheny, for assignees in bankruptcy.

William M. Brown, for creditor.

HUNT, Circuit Justice. Upon an application to expunge the proof of debt made by the assignees of the People's Safe Deposit and Savings Institution of the State of New York, the register reports that he has taken the evidence offered, and that the facts following are established by said evidence: (1.) That no claim is made by the assignees of said People's Safe Deposit and Savings Institution of the State of New York against the estate of Jaycox & Green, except the notes set out in schedule "A" annexed to the proof of debt, filed April 23d, 1873, amounting, of principal, to $35,-272.20. (2.) That the People's Safe Deposit and Savings Institution of the State of New York was a corporation organized under and by virtue of the provisions of chapter 816 of the Session Laws of the State of New York for 1868, the capital stock of which corporation was $300,000, owned by divers individuals. (3.) That said corporation had a banking office in Utica and one in Syracuse. (4.) That, from April, 1871, until the bankruptcy of Jaycox & Green, in May, 1872, the corporation, in its office at Syracuse, discounted the paper of Jaycox & Green, to the amount of several hundred thousand dollars, and that, at the time of their bankruptcy, said corporation held their discounted paper, which paper is particularly described in the schedule annexed to the amended or supplemental proof of debt, filed September 15th, 1874. (5.) That, from April, 1871, until the bankruptcy of said corporation, it carried on a regular banking business, except that it did not issue circulation of its own, discounting, during that period, a large amount of paper, selling exchange, and doing, in fact, the ordinary business of a bank of discount and deposit, and doing a large business of that character for a city like Syracuse, so

that, at the bankruptcy of said corporation, it had between $600,000 and $700,000 of discounted commercial paper standing out; and that, during the period referred to, the corporation kept a regular office for discounts and deposits in Syracuse, kept a large number of mercantile accounts, and made large discounts for merchants. (6.) That Jaycox & Green were wholesale grocers at the time the notes set out in the proofs of debt were discounted; that these notes were discounted at about their respective dates, and their proceeds were applied to the payment of other commercial paper of Jaycox & Green, which had been discounted for them; and that the line of accommodation paper discounted by said corporation for Jaycox & Green, for a year previous to their failure, amounted to $35,000 and upwards. (7.) That there were fifteen trustees and directors of said corporation, and of these some resided in Syracuse or its vicinity, but they were not at the banking room very frequently. (8.) That the stock ledger of the corporation shows that, at the time of its bankruptcy, the trustees and directors held $193,000 of its capital stock. (9.) That the corporation, besides discounting notes, made loans on bonds and mortgages and stocks, and received deposits, and issued pass-books therefor in the same form as those of savings banks; and that, at the time of its suspension, the entire deposits in the corporation at Utica and Syracuse, was between $1,300,000 and $1,400,000. (10.) That the capital stock paid in at the time of the suspension of said corporation, was $75,000, and the residue of the money used by the corporation in discounting paper consisted of deposits and accumulations, and such accumulations amounted to $40,000. (11.) That the office of the corporation at Syracuse commenced discounting commercial paper and keeping commercial accounts soon after April 1st, 1871, and this was done by a resolution of the board of directors. (12.) That, at the time of the suspension of the corporation, pretty much all of the deposits in it at Utica were of the character of savings bank deposits, and upwards of $1,000,000 of the deposits were of that character. The register reported that said proof of debt should be expunged. The matter came on to be heard before Judge Wallace, the district judge, and he having been of counsel in the matter, declined to hear it, and ordered that fact to be entered of record. It was, therefore, ordered that the proceedings be certified to, and transferred into this court.

The findings of the register are sustained by the proof, and present a clear and succinct statement of the facts of the case. Whether, upon these facts, a claim exists in favor of the Deposit Savings Bank, against the estate of Jaycox & Green, is the question to be decided.

For the purpose of brevity and conven-

lence, the institution described in the petition in this case as "The People's Safe Deposit and Savings Institution of the State of New York," will be termed the "Safe Deposit Company." This company was organized under and by virtue of the provisions of the act of the legislature of New York, passed May 14th, 1868 (chapter 816, p. 1839, Laws 1868). By the first section of that act the persons named were created a corporation, by the name and style above given, to be located outside of the cities of New York and Brooklyn, and, by the second section, the persons named were to constitute its board of directors for the first year. The provisions of the chapter are peculiar in many respects, but, for the purpose before us, it will only be necessary to notice the following: Section five provides that "the business and general object of the said corporation shall be to take and receive on deposit, as bailee, for safe keeping and storage, coin, bullion, gold and silver plate, jewelry, United States bonds, &c., and to receive money from any estate * * * or persons on deposit and give a book, receipt, or certificate therefor, * * * and any rate of interest not exceeding that by law allowed for deposits." By the eleventh section, the board was required to "invest its capital in good securities, * * * in bonds and mortgages, public securities or stocks of any state or of the United States, or in the stocks or bonds of any city, county or town, corporation or association, or otherwise, of any state, or the United States, in manner and form as the directors and officers might think proper." By section fourteen, it was declared to possess the powers, and be subject to the restrictions, contained in title third of chapter eighteen of the first part of the Revised Statutes, so far as applicable. That title enumerated the general powers of corporations, of suing and being sued, succession and the ordinary powers of incorporations. It contained also the following: Section 3: "In addition to the powers enumerated * * * no corporation shall possess or exercise any corporate powers except such as shall be necessary to the exercise of the powers so enumerated and given." Section 4: "No corporation, * * * not expressly incorporated for banking purposes, shall, by any implication or construction, be deemed to possess the power of discounting bills * * * receiving deposits * * * buying and selling bills of exchange," &c. 1 Rev. St. p. 600.

The constitution of the state of New York, of 1846, contained the following provision: "Corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes, and in cases when, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws." Article 8, § 1. Under this authority, the legislature had passed a general banking

law, providing that any persons might "establish offices of discount, deposit and circulation, upon the terms and conditions, and subject to the liabilities, prescribed in the act." Act April 18, 1838 (Laws 1838, c. 260). There was not at that time, nor until the year 1875, any general system for the incorporation of savings banks. In each case it was necessary to apply to the legislature for an act of incorporation. What is familiarly called the restraining act of the state of New York, contains the following provisions: "No person unauthorized by law shall subscribe to, or become a member of, or be in any way interested in, any association, institution or company, formed or to be formed for the purpose of receiving deposits, making discounts or issuing notes or other evidences of debt to be loaned or put in circulation as money; nor shall any person unauthorized by law subscribe to, or become in any way interested in, any bank or fund created or to be created for the like purposes or either of them." 1 Rev. St. p. 712, § 1. "No incorporated company, without being authorized by law, shall employ any part of its effects * * · * for the purpose of receiving deposits, making discounts, or issuing notes or other evidences of debt, to be loaned or put into circulation as money." Id. § 3. "All notes and other securities for the payment of any money, or the delivery of any property, made or given to any such association, institution or company, that shall be formed for the purpose expressed in the first section of this title, or made or given to secure the payment of any money loaned or discounted by any incorporated company, or its officers, contrary to the provisions of the third section of this title, shall be void." Id. § 5. By an act passed February 4th, 1837 (Laws 1837, p. 14, § 1), the provisions of the above act, so far as they prohibited persons not incorporated from keeping offices for the purpose of receiving deposits, or discounting notes or bills, were repealed. As to incorporated companies, the act yet remains in force, as above set forth. With these references to the constitution and laws, we are prepared to decide without difficulty some of the preliminary questions of the case.

1. The safe deposit company was not a bank of discount and deposit, authorized to do the ordinary banking business of receiving current deposits, paying dealers' checks and discounting commercial paper. It was a savings bank, authorized to do the ordinary business of a savings bank, and authorized to receive on deposit, as bailee, and for safe keeping, the articles of value and securities mentioned in its charter. The legislature did not intend and had no power under the constitution, to organize by special charter a bank of discount and deposit. If those obtaining the charter had such an intention, it was a dishonest and a furtive one. There is no language in the charter that confers powers other than those conferred on ordinary savings banks, except in relation to its capacity to receive, as bailee, the valuable articles referred to.

2. The directors and managers of the bank intentionally and habitually violated the law in carrying on an ordinary banking business, including that of making discounts of notes. The proof shows, that, at the time of bankruptcy, it had more than $600,000 of discounted commercial paper outstanding, and that this business was done by the express direction of its board of directors, and by the sanction of the stockholders.

3. The notes in controversy, amounting to $35,272.20, were thus discounted by the safe deposit company, in known violation of the laws of the state. Jaycox & Green, the borrowers, are in bankruptcy, and the safe deposit company is in bankruptcy. The estate of the borrowers, ordinarily, should stand indebted for money actually received as a loan by its principals. This is the ordinary rule of law, and the enquiry is, whether other and counteracting principles must in this case prevail against it.

The objection to the right of recovery by the safe deposit company while in existence, and by its assignees after its bankruptcy, is based upon the provisions of the Revised Statutes and of the restraining act. By the third section of this latter act, already quoted, every incorporated company not authorized by law is forbidden to make discounts of commercial paper. By the fifth section, it is enacted, that every note or other security made in contravention of the preceding section "shall be void." It is plain, from what has been said, (1st,) that the safe deposit company is an incorporated company; (2d,) that it had not the authority of law to discount this paper, (People v. Utica Ins. Co., 15 Johns. 358); and (3d,) that, without such authority, it did discount it. The restraining statute first forbids the transaction, and, secondly, declares that the notes given for such a transaction shall be void. The contract itself is forbidden, and, therefore, illegal, and the security is also declared to be void. It is forbidden, both by section 4 of title 3 of chapter 18, above cited, the company not being "expressly incorporated for banking purposes," within the meaning of that act, and by section three of the restraining act, also herein before referred to.

The illegal character of the contract, and its invalidity, as well as the invalidity of the security given upon it, is not an unusual condition of things under the laws of New York. The loaning of money at a greater rate of interest than seven per cent. per annum is forbidden by law. The contract of loan, when thus made, is illegal, and any security taken in in furtherance of it is void. 1 Rev. St. p. 772, §§ 2, 5. A contract to pay money arising out of a betting or gaming transaction is forbidden by law, and the contract itself, and any security connected with it, are equally void. Id. p. 662, § 8. A con-

tract for the sale or purchase of lottery tickets, or articles by raffle, is in like manner forbidden by law, and the contract itself and all securities arising out of it are void. Id. p. 665, §§ 22, 24, 26, 27, 34, etc.

The argument to sustain the claim of a recovery on the part of the safe deposit company, is based upon the idea that the loan of money by the bank is legal, that its charter authorized the company to make loans, and that it was the form, time and manner of the loan which was objectionable; and that hence, while the security which embodies these objections is illegal and void, and cannot be recovered upon, the loan or the debt may and does remain valid. To support this view are cited what are called the "Utica Insurance Cases": Utica Ins. Co. v. Scott, 19 Johns. 1; Same v. Cadwell, 3 Wend. 296; Same v. Bloodgood, 4 Wend. 652; Same v. Kip, 8 Cow. 20; Same v. Scott, Id. 709.

The case in Johnson's Reports, against Scott, arose upon a demurrer, and simply went to the point adjudged in the "Per Curiam" opinion, that the security was void under the restraining act, and judgment was ordered accordingly. The remark that, although the security was void, the money lent might be recovered, was entirely obiter.

In the case against Kip (8 Cow. 20), the question was presented upon the second plea, which was for money lent, and the court held, that, although the security was void, the loan constituted a valid cause of action, and gave judgment for the plaintiff. The only direct authority cited was the case against Scott, above referred to. The obiter remark of the court in that case is quoted in full.

The case of Scott was carried to the court of errors (8 Cow. 709), where the judgment below was reversed. It was there held, (1st,) that the insurance company had the right to loan their surplus funds, and to take a note as evidence of the debt (page 718); (2d,) that the restraining act did not apply to that company, by reason of the provision of their charter allowing them to invest their funds (page 719). These were the conclusions of Spencer, J., in the only prevailing opinion reported.

In Utica Ins. Co. v. Cadwell, 3 Wend. 296, the decision in Kip's case was adopted without comment or discussion. The court (Sutherland, J.) say, that there is a distinction, as held by the former cases, between the security and the contract of lending; and that, as the lending was not declared to be void, wherever money was lent it might be recovered under the common counts, although no action could be sustained upon the security. The note was held to be competent evidence of money lent, under the common counts.

In relation to these cases I observe:

1. That they are distinguishable from the present in one important feature, viz., that the insurance company had the right to make personal loans of their surplus funds, and whether they made the loan upon the security of a bond or a note, or without either, it was declared, made no practical difference. This was the opinion of Spencer, Senator, in Scott's Case, 8 Cow. 709. The company, in the present case, had no power to make personal loans. Its powers were restricted and limited to those contained in its charter. This is expressly declared in the provision of the Revised Statutes, already cited. Upon turning to the authority to make its loans, we find the subjects specifically set forth, as the stocks of the United States, or of the states, bonds and mortgages, bonds of cities or towns. Personal loans are not mentioned, and are, therefore, by statute, excluded from the class in which the moneys of this company can be invested.

2. The terms of the restraining act now in force, as well as the language of the Revised Statutes, are quite different from the language of the act in force when the Utica Insurance Cases were decided. "No incorporated company, without being authorized by law, shall employ any part of its effects * * * for the purpose of making discounts." 1 Rev. St. p. 712, § 3. Here is a positive prohibition against investing the funds of a corporation in discounted bills. Such a contract is illegal, as being positively forbidden by law. The language of the old act was aimed at the creation of a company and the establishment of an office, like that of section one of the present act, forbidding the becoming members of a company for the purpose of issuing notes, making discounts &c., and not containing the language above quoted. 2 Rev. Laws, 1813, p. 234, § 2. Neither does the old law contain the provision of title 18 of the Revised Statutes, that no corporation not expressly created for banking purposes, shall, by any implication or construction, be deemed to possess the power of discounting bills. Had the Revised Laws of 1813, which were in force when the Utica Insurance Cases were decided, contained these provisions, there is no reason to think they would have been decided as they were.

3. The correctness of the decisions in those cases, has been repeatedly questioned, and their authority much weakened. See New Hope & D. Bridge Co. v. Poughkeepsie Silk Co., 25 Wend. 650, opinion of Mr. Justice Nelson; Tracy v. Talmage, 14 N. Y. 189, opinion of Mr. Justice Selden; and the opinion of Mr. Justice Comstock, in Curtis v. Leavitt, 15 N. Y. 98. To give them the force contended for, will render the restraining act substantially useless. If their holding is as broad as is contended for, they are in direct hostility to an almost endless line of authorities, to the effect that the violator of the law cannot recover upon a contract embracing or founded upon that violation.

4. The Utica Insurance Cases should not be confounded with that class of cases of

which Oneida Bank v. Ontario Bank, 21 N. Y. 490, and Curtis v. Leavitt, 15 N. Y. 9, are instances, in which the plaintiffs recovered for money advanced, although their security was repudiated. In the first of these cases, the statute of New York (Act May 14, 1840; Laws 1840, p. 306, § 4) was involved which declared that "no banking association shall issue or put in circulation any bill or note of such association, unless the same shall be made payable on demand and without interest." Mr. Augustus Perry loaned to the Ontario Bank $14,000 and took its drafts on Duncan & Sherman of New York, for the amount, all being made and delivered about four weeks before their dates. The court held, (1) that these were drafts, within the statute mentioned; (2) that they were not payable on demand; (3) that they were illegal and void; and, (4) that the lender or holder could recover from the bank issuing them the amount of money so loaned. The principle of this decision was this, that Perry had done nothing prohibited by law. He had simply loaned his money to the bank, and the bank had received it. The bank violated a positive provision of the statute in making its security for the loan payable on time, but Perry violated no law. All the cases recognize the distinction between the guilty party to an illegal contract and the innocent party. The bank violated a provision of the statute, in making its drafts payable on time, and was liable to its penalties, but Perry violated no law, statutory or moral, and was subject to no punishment. The cases of Tracy v. Talmage, 14 N. Y. 162, Curtis v. Leavitt, 15 N. Y. 9, and Sackett's Harbor Bank v. Codd, 18 N. Y. 240, involve the same principle. In the case before us it is the guilty party, the violator of the law, the safe deposit company, that seeks to enforce the illegal contract, against a party comparatively innocent.

It is further contended, admitting these loans to be illegal, that no title to the money received by Jaycox & Green passed to them, that the assignees represent stockholders and creditors, and that they have the right to recall the money, in an action for money had and received. The powers and authority of an assignee in bankruptcy are such as are given to him by the statutes of the United States. Every assignee appointed under the bankrupt act possesses the same power, whether the scene of his action is in New York, Illinois or Texas. The statutes of a state cannot take away from him any of his lawful powers, nor, I apprehend, are his powers to be increased by the effect of state statutes. He is strictly and essentially a creation of the United States authority, intended to be subject to the United States jurisdiction, under a system of bankruptcy which shall be uniform throughout the whole country. It is to the statutes of the United States, therefore, and not to the statutes of the state of New York, giving power to local and state trustees, executors or assignees, that we are to look for the solution of the question now under consideration. Curtis v. Leavitt, 15 N. Y. 44.

The powers and the authority of an assignee in bankruptcy are particularly specified in the fourteenth section of the bankrupt act. 14 Stat. 522. The register is, in that section, directed to make a conveyance to the assignee of "all the estate, real and personal, of the bankrupt," and thereupon, "the title to all such property and estate, both real and personal, shall vest in said assignee." It is further declared, "that all the property conveyed by the bankrupt in fraud of his creditors, all rights in equity, choses in action, * * * all debts due him or any person for his use, * * * all his rights of action for property or estate, real or personal, and for any cause of action which the bankrupt had against any person, arising from contract or from the unlawful taking or detention of, or injury to, the property of the bankrupt * * * shall * * * be at once vested in such assignee." It is further declared, that the assignee "may sue for and recover the said estate, debts and effects, and may prosecute and defend all suits at law or in equity pending at the time of the adjudication in bankruptcy, in the same manner and with the like effect" as the bankrupt could have done. There are numerous provisions scattered through the act to carry out these powers, but the powers enumerated above, it is believed, embrace every authority that can bear upon the point under consideration. In substance, the statute gives authority to the assignee, (1st,) to seize, sue for and recover any and all property, estate or rights belonging to the assignee at the time of the commencement of the proceedings in bankruptcy; and, (2d), to sue for and recover any property conveyed by the bankrupt in fraud of his creditors. If the property belonged to the bankrupt at the time specified, or he then had an interest in it, legal or equitable, whatever might be its form, a right at once vested in the assignee. If the bankrupt had no such right or interest, but would have had, except that he had previously made a conveyance of his property for the purpose of defrauding his creditors, the assignee was authorized to attack such fraudulent conveyance and recover the property which had passed under it. As against the bankrupt, that conveyance was good, but, as representing his creditors, who, under certain circumstances, could attack it, the assignee was authorized to take measures to set it aside.

The claim against Jaycox & Green does not fall within either branch of this authority. The money loaned by the safe deposit company to Jaycox & Green became the property of the latter, was taken by them into their possession, and became mixed with, and a part of, their general funds. It was, for this

purpose, the case of an ordinary loan of money, by which the lender parts absolutely with his money and all right and interest in it, and receives in return the note or other security of the borrower. The lender has no rights in law or equity to the money loaned, or any lien or claim upon the same. The present loan, although forbidden to be made by the safe deposit company, and illegal on their part, was nevertheless, made in fact. It was an accomplished fact, and the money and all interest in it passed beyond the control of the company, more completely, if possible, than in the ordinary case of money loaned.

Nor can the transaction come under the head of a conveyance by the bankrupt of his property "in fraud of his creditors." That is a case of one who, for his own benefit or that of his family, conveys property in which he secretly reserves an interest for his own benefit, or by which he intends dishonestly to prefer one class of creditors to another. Here, the safe deposit company intended no reserved benefit to itself. Jaycox & Green were parties to no such intention. Nor was it intended to prefer one creditor or class to another.

The safe deposit company, in violation of law, entered upon a general banking business. As a part of that business, it loaned the money in question. It was an illegal contract. It was made, however, by the corporation, under a formal resolution of its board of directors, and sanctioned by the acquiescence of its stockholders at its annual meetings. It has been already shown that the company could not recover either upon the security received or for money loaned. If it is possible for a corporation itself to make a contract so that the question of an excess of power on the part of its agents cannot arise, this is such a case.

The point under consideration is not well taken, and, upon the whole case, I am of the opinion that the claim of the assignees against the estate of Jaycox & Green cannot be sustained, and that the proof of the debt of the safe deposit company must be expunged.