## MANCHESTER & LAWRENCE RAILROAD *v.* CONCORD RAILROAD & *a.*

One railway company which, under a contract, has used the road-bed, rolling-stock, and equipments of another, cannot set up as a defence to a bill in equity by the latter for an accounting and a return of the property, that the contract was *ultra vires.*

A contract between rival and competing railway companies made for the purpose of preventing competition, but not for the purpose of raising the prices of transportation above a reasonable standard, is not void as against public policy.

Where an illegal contract of consolidation between two competing railway lines has been executed, and the defendant has derived all the benefits arising from the contract, its illegality is no defence to a bill in equity for an accounting and a return of the consideration to the plaintiff whose property and equipments passed to the defendant under the contract.

Where a contract, illegal only because prohibited by statute, has been executed by one of the parties, the other will not be allowed to retain its benefits and at the same time set up its illegality.

Where a prosecution for a penalty is barred by the statute of limitations, a party cannot refuse to discover matters connected with the transaction on the ground that such evidence will induce an exposure to the penalty.

BILL IN EQUITY, against the Concord Railroad Corporation and others, directors and officers of the defendant corporation. The facts are stated in the opinion.

*W. S. Ladd* and *Charles H. Burns* (with whom was *James F. Briggs*), for the plaintiffs.

I. The first plea alleges facts from which it is claimed that the contract and arrangement under which the Concord corporation possessed and operated the property and road of the Manchester & Lawrence were not within the corporate power and authority of either corporation to make; whence the conclusion is sought to be drawn that said contract was utterly void in its inception, so as to preclude each of the parties to it absolutely from the aid of the court in enforcing an accounting and payment from the other for benefits received in its past performance. It is creditable to modern civilized jurisprudence that such is not the law. "The plea of *ultra vires* should not prevail, whether interposed for or against a corporation, when it would not advance justice, but would perpetrate a wrong." *Chicago & A. Railroad Co.* v. *Derkes,* 103 Ind. 520; *Whitney Arms Co.* v. *Barlow,* 63 N. Y. 62; *Camden & Atlantic Railroad* v. *Railroad,* 48 N. J. Law 530; *Denver Fire*

*Ins. Co.* v. *McClelland,* 9 Col. 11; *Wright* v. *Pipe Line Co.,* 101 Pa. St. 204; *Steam Navigation Co.* v. *Weed,* 17 Barb. 378; *Union Nat. Bank* v. *Matthews,* 98 U. S. 621; *Silver Lake Bank* v. *North,* 4 Johns. Ch. 370; *Chester Glass Co.* v. *Dewey,* 16 Mass. 94; *Gold-Mining Co.* v. *Nat. Bank,* 96 U. S. 640; *Standard Oil Co.* v. *Scofield,* 16 Abb. New Cas. 372; 2 Mor. Corp., *s.* 689.

II. The second and third pleas go upon the same ground, namely, that the contract with respect to which an accounting is asked was forbidden by the law of 1867, because the two roads were rival and competing roads within the meaning of that act, and therefore that the contract was absolutely void to all intents.

It is to be observed that there is no express declaration in the statute that a contract made or carried on in contravention of its terms shall be void; and, further, that the statute was not passed until nearly seven years after the contract was entered into.

The plaintiffs rely upon *Harris* v. *Runnels,* 12 How. 79, as a strong authority fully sustaining their views upon this point in the case. That was an action to recover the amount of a promissory note given for the price of a slave brought into Mississippi, and sold by the plaintiff to the defendant in violation of a statute which prohibited, under a penalty of $100 upon both buyer and seller, the sale and purchase of a slave under the circumstances shown in the case; and judgment was ordered for the plaintiff.

In *Bowditch* v. *Life Ins. Co.,* 141 Mass. 292, it was held that " if a statute does not declare void a contract made in violation of it, and if it is not necessary to so hold it in order to accomplish the purpose of the statute, the inference is that it is intended to be directory and not prohibitory of the contract." To the same effect, in principle, see *Holden* v. *Upton,* 134 Mass. 177; *Prince* v. *Baptist Church,* 2 West. Rep. 621 (Mo.).

*Chase & Streeter* and *J. H. Benton, Jr.* (with whom was *J. W. Fellows*), for the defendants.

The Manchester & Lawrence Railroad in this suit asks the court to compel an accounting between the Concord Railroad Corporation and itself as to the operation and business of the roads of itself and of the Concord Railroad Corporation under these contracts. The question at bar is, whether the court will compel such an accounting,—that is to say, will enforce such contracts so far as to decree an accounting and enforce payment as to business done under them.

I. The demurrer to the defendants' pleas admits that the contracts under which the defendants are alleged to have operated, managed, and controlled the road of the plaintiffs, and which the plaintiffs ask the court to enforce by compelling an accounting and payment as to business done under them, " were wholly beyond the power of the plaintiffs and defendants, or either of them, to

make or to ratify," and were " made for the purpose of destroying and preventing, and did destroy and prevent, competition between the plaintiffs and defendants, by which the prices of transportation upon their roads would have been materially reduced." Such contracts were obviously against public policy and illegal, and neither party can have any remedy against the other on the basis of them, or by reason of anything done under them. It is in contravention of public policy for corporations to exercise powers not granted to them ; and a contract beyond their corporate power to make, by which railroad companies deprive the public of the benefits of competition between them, is illegal as creating an unauthorized monopoly. *Bissell* v. *Railroad*, 22 N. Y. 258; *Peoria & R. I. R. R. Co.* v. *Coal Valley Mining Co.*, 68 Ill. 489; *State* v. *Hartford, etc., R. R.*, 29 Conn. 538; *Stewart* v. *Transportation Co.*, 17 Minn. 372, 399. The purpose of the act of 1867 was to prevent the increase of the charges of rival and competing roads beyond what might be expected under the influence of a free competition. *Currier* v. *Railroad*, 48 N. H. 321. Under it the officers and agents of the plaintiff and defendant companies were severally subject to indictment and fine for attempting to carry out the provisions of the contracts set up in the plaintiffs' bill. To say that either party, notwithstanding the contracts were prohibited under such penalties, can invoke the aid of the court to adjust controversies arising out of such prohibited and illegal action, is to say that the court will punish such illegal action with one hand, while with the other it apportions the result of it between the guilty parties. This is not a case like *Bowditch* v. *Life Ins. Co.*, 141 Mass. 292, where the question arises between two parties, one of which has violated a law and the other has not, and where the purpose of the act would be defeated by holding the contract to be illegal, but one where both parties knowingly acted in violation of the law, and where the purpose of the act to protect the public from the destruction of competition by such contracts as the parties made would be wholly thwarted unless the contracts are held void. *Miller* v. *Post*, 1 Allen 434; *Forster* v. *Taylor*, 5 B. & Ad. 887; *Smith* v. *Arnold*, 106 Mass. 269.

II. The allegations of the third plea state a case that unmistakably falls within the prohibition of the " act to prevent railroad monopolies," passed July 5, 1867. It is true that this statute does not say *in haec verbae* that " all contracts made in contravention of its provisions shall be void;" but it expresses that idea "in language too plain to be misunderstood." It says that neither of said lines—referring to rival and competing lines of railroads like the plaintiffs' and defendants' roads—shall be run or operated by its rival or competitor " under any business contract, lease, or other arrangement, but each and every railroad corporation so situated shall be run, managed, and operated separately by its own officers and agents, and be dependent for its support on its own earnings

from its local and through business in connection with other roads, and the facilities and accommodations it shall afford the public for travel and transportation under fair and open competition." A contract which the parties are thus expressly prohibited from performing is a void contract; it has no force or validity.

The statute also inflicts penalties upon the directors, officers, and agents of corporations who violate its provisions. It is held in this state that this implies a prohibition, and renders contracts made in violation of the statute illegal, although the statute does not expressly declare them to be so. *Roby* v. *West*, 4 N. H. 285; *Udall* v. *Metcalf*, 5 N. H. 396; *Bliss* v. *Brainard*, 41 N. H. 256, 268, 269; *Smith* v. *Godfrey*, 28 N. H. 379, 384.

The plaintiffs' counsel rely upon *Harris* v. *Runnels*, 12 How. 79, as a strong case in their favor. We understand the rule there laid down differs somewhat from the rule established in this state by the authorities above cited. Our court gives more weight to the penalty features of such statutes in establishing the legislative intent to render void contracts conflicting with them, than do the United States courts and the courts of some other jurisdictions. However this may be, we think *Harris* v. *Runnels* supports our position rather than the plaintiffs'. It is there said that "where a statute prohibits an act or annexes a penalty to its commission, it is true the act is made unlawful, but it does not follow that the unlawfulness of the act was meant by the legislature to avoid a contract made in contravention of it. Where a statute is silent, and contains nothing from which the contrary can properly be inferred, a contract in contravention of it is void. But the whole statute must be examined in order to decide whether or not it does contain anything from which the contrary can properly be inferred." Our statute does not say that a contract conflicting with it is valid, but it is not silent upon this point; as we have shown, it plainly says, in effect, such a contract is void. And when the whole statute is examined, nothing can be discovered anywhere among its terms from which it can properly be inferred that such a contract is valid.

III. The plaintiffs pray discovery, "but not under oath, that being waived," and the defendants demur. It is obvious that if, upon the case stated in the bill, the plaintiffs are not entitled to relief, they are not entitled to discovery. *Emery* v. *Bidwell*, 140 Mass. 271; *Walker* v. *Brooks*, 125 Mass. 241. This objection goes to the merits of the whole bill, which have already been discussed. But if the bill was meritorious, and stated a case entitling the plaintiffs to relief, the discovery here prayed for cannot be had,— (1) because a prayer for a so called discovery, not under oath, cannot be granted by the court; (2) because the policy of the law exempts the defendants from discovery; (3) because, under the fundamental law of this state, the defendants are not required to make such discovery.

1. Discovery (so called) not under oath cannot be granted. The sole purpose of discovery in equity is to enable the plaintiff to "probe the conscience" of his adversary, and to force him to disclose by his answer, under oath, facts and circumstances within his knowledge in support of the party's contention. Discovery (so called) not under oath is not discovery. Discovery not under oath is not known in equity practice. To apply the term "discovery" to a statement not under oath is a misnomer. A bill waiving the defendant's oath cannot be maintained for discovery. *Ward* v. *Peck*, 114 Mass. 121; *Badger* v. *McNamara*, 123 Mass. 117.

2. The policy of the law exempts the defendants from discovery. A court of equity will not lend its aid in favor of a party seeking a discovery to support an action which is against public policy. Sto. Eq. Pl. (4th ed.) 573, and cases cited.

3. The fundamental law does not require the defendants to discover. The act of July 5, 1867, entitled "An act to prevent railroad monopolies," reënacted in General Laws (1878), and existing as a positive law of this state from the time of its original enactment, provided a penalty of $500 against each director, officer, or agent who should be concerned in any violation, or attempt to violate, the provisions of the act. The allegations on which the plaintiffs base their claims for relief against the Concord Railroad charge each of the defendants with the doing of that which was positively prohibited by the act of July 5, 1867. The allegations being sustained, each of the defendants is liable to the penalty provided by the statute. The act imposing the penalty is a public penal statute. The plaintiffs have no power to waive the penalty provided therein. The plaintiffs now ask the defendants to make discovery of facts which in any event would tend to fix their penal liability under the act referred to. The fundamental law, that "no subject shall be compelled to accuse or furnish evidence against himself," will not permit the granting of the discovery prayed for in this proceeding. These legal principles have been announced in every jurisdiction where the question has been considered, and were particularly stated by this court in *Currier* v. *Railroad*, 48 N. H. 332, 333; *Morrill* v. *Railroad*, 55 N. H. 531.

*W. S. Ladd* and *Fletcher Ladd*, for the plaintiffs.

The action is a bill in equity praying that justice be done between the parties. The answer is, that all the conduct of the defendant corporation out of which the supposed obligations have arisen was unlawful, and unauthorized on their part.

1. The parties are not *in pari delicto.* Whatever complexion as to turpitude the defendants may now succeed in placing upon their own past conduct, it is confidently maintained that the facts set forth in the bill show that the Concord Railroad have been, from beginning to end, the principal offender, the principal law-breaker,

the party taking advantage of their relations with the plaintiff corporation, and the power thereby acquired and maintained by them over that corporation, to promote their own gain, their own schemes and enterprises, whether lawful or not, and therefore that the two parties are not *in pari delicto*, whatever meaning be given to the word *delictum.*

It is to be remarked here, that the contract of December 27, 1860, was not an immoral contract in any sense of the word. The business, for the carrying on of which it provided, was legitimate, and highly beneficial to the public. It was in no way opposed to public policy or good government. The same business had been carried on for eleven years, openly and publicly, in the same way, under contracts identical with that of December 27, without objection from any source, and with the express approval of the proper public functionaries. The point is, that, whether prohibited or not, neither the contract, nor the subject-matter to which it relates, was immoral. There was no turpitude in it, whatever the plaintiffs may now think or say of their own former conduct.

Assuming that there is no moral turpitude on the part of either corporation, but that their acts were in fact technically unauthorized or illegal, it makes no difference whether the illegality arises from one cause or another: they are not *in pari delicto*, and the rule *potior est defendentis* does not apply. *Smith* v. *Bromley*, 2 Doug. 696, *n.*; *Worcester* v. *Eaton*, 11 Mass. 368; *Tracy* v. *Talmage*, 14 N. Y. 162; *Schermerhorn* v. *Talman*, 14 N. Y. 93, 123; *Jaques* v. *Golightly*, 2 Wm. Bl. 1073; *Browning* v. *Morris*, Cowp. 790; *Williams* v. *Hedley*, 8 East 378; *White* v. *Franklin Bank*, 22 Pick. 181, 186, 188; *Ford* v. *Harrington*, 16 N. Y. 285; *Osborne* v. *Williams*, 18 Ves. 379; *Harrington* v. *Grant*, 54 Vt. 236; Sto. Eq. Jur., s. 300.

The demurrer to the first plea admits that the contracts involved an unauthorized exercise of corporate power on the part of the two roads. The question arising upon this plea and the demurrer is as to the bearing of this fact upon the plaintiffs' right to maintain the bill. What rights and liabilities have the parties to an executed *ultra vires* contract? Can a party to such a contract between two corporations escape from liability to make restitution for benefits received under it by interposing the plea that the contract was one which under their charters and the general laws of the state the corporations had no power to make?

Mr. Morawetz's answer to these questions is in terms which cover not only equitable actions of the character of the present, but also, as will be observed, actions brought specially upon the *ultra vires* contract itself. The general principle, as laid down by him at the head of s. 689, is as follows: "After a contract entered into by a corporation has been performed by either of the contracting parties, the fact that the making of the contract involved an unauthorized exercise of corporate power on the part of the

company will not constitute a defence to an action, brought by the party having performed the contract, to recover compensation for a breach of the contract by the other party."

This statement of law is fully borne out by the authorities: *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62; *Hall Mfg. Co.* v. *American R'y Supply Co.*, 48 Mich. 331, 333; *Oil Creek & Allegheny River R. R. Co.* v. *Penn. Transportation Co.*, 83 Pa. St. 160, 166; *Camden & Atlantic Railroad* v. *Railroad*, 48 N. J. Law 530; *Bradley* v. *Ballard*, 55 Ill. 413, 417; *Ohio & Mississippi R'y Co.* v. *McCarthy*, 96 U. S. 258, 267; *Pneumatic Gas Co.* v. *Berry*, 113 U. S. 322, 327; *Union Water Co.* v. *Murphy's Flat Fluming Co.*, 22 Cal. 620; *State Board* v. *Citizens St. R'y Co.*, 47 Ind. 407; *Newburg Petroleum Co.* v. *Weare*, 27 Ohio St. 343, 353; *Slater Woollen Co.* v. *Lamb*, 143 Mass. 420; *Hall* v. *Paris*, 59 N. H. 71; *Norton* v. *Derry Nat. Bank*, 61 N. H. 589; *Parish* v. *Wheeler*, 22 N. Y. 494; *Darst* v. *Gale*, 83 Ill. 136; *Ward* v. *Johnson*, 95 Ill. 215; *Peoria & Springfield R. R. Co.* v. *Thompson*, 103 Ill. 187; *Steam Boat Co.* v. *McCutcheon*, 13 Pa. St. 13; *Terry* v. *Eagle Lock Co.*, 47 Conn. 141; *De Groff* v. *American Linen Thread Co.*, 21 N. Y. 124, 127; *Underwood* v. *Newport Lyceum*, 5 B. Mon. 129; *Southern Life Ins. & Trust Co.* v. *Lanier*, 5 Fla. 110, 165; *Chicago Building Soc.* v. *Crowell*, 65 Ill. 453; *Pine Grove* v. *Talcott*, 19 Wall. 666, 678; *Rutland & Burlington R. R. Co.* v. *Proctor*, 29 Vt. 93; *Prairie Lodge* v. *Smith*, 58 Miss. 301, 308; *Hitchcock* v. *Galveston*, 96 U. S. 341, 351; *Mfg. Co.* v. *Canney*, 54 N. H. 295, 318–327; Pierce R. R. 519 *et seq.;* Wat. Spec. Perf., s. 226.

The above authorities are cited solely upon the issue raised by the demurrer to the first plea, namely, that the fact that the contracts were such as the corporations had no power by their charters or the laws of the state to make disentitles the plaintiffs to a recovery. If this claim be tested by the rule laid down by the supreme court of the United States in *Railway Co.* v. *McCarthy*, 96 U. S. 258, that "the doctrine of *ultra vires*, when invoked for or against a corporation, should not be allowed to prevail where it would defeat the ends of justice or work a legal wrong"—a rule, it is submitted, which embodies in few words the result of all the authorities, and the *ratio decidendi* of all the cases—the result will not be doubtful. The effect of the alleged statutory prohibition of the contracts will be considered hereafter, when we come to examine the issue raised by the third plea and demurrer.

The second plea and the demurrer to it raise the questions whether the contracts under which the Concord Railroad controlled and operated the Manchester & Lawrence Railroad were illegal because contrary to public policy, and without reference to any statutory prohibition. Stated in a general form, the question is, whether a contract for the lease of one of two competing roads by the other, and for a division in fixed proportions of the net earnings of the two between them, involves a menace to the well-

being of the body politic so serious in its character as to call upon the state to interpose through the court and declare it opposed to the principles of the common law. The defendants say that it does, and base their argument upon the ground that a combination of two rival railroads destroys competition between them, and that uncontrolled competition among railroads is in the nature of things a benefit to the public. That this is ordinarily or necessarily so we deny; that it was so in this case is not admitted by the demurrer; and a consideration of the relative situation in which these two roads stood to each other at the time the leases were made will show that the effects of unrestrained competition between them would have been quite the reverse of beneficial, either to themselves or to the public. Let us here call attention to the fact that while the demurrer admits that the contracts in question were made for the purpose of preventing competition between the two roads, by which the prices of transportation upon them would have been reduced, it does not admit that these prices were by reason of the contracts raised above a reasonable standard, or that the public were in any way prejudiced by their operation.

So far as appears from the pleadings, the rates were reasonably low at the time the agreements were made. The precise question raised by the demurrer to the second plea is, therefore, as we have stated it above, whether in general a combination between competing railroads is contrary to public policy, and a contract made to effect such a combination illegal. Is the danger to be apprehended from a combination of the character of the one in question between two competing railroads so great as to override this paramount public policy, and justify the state in interfering with the liberty of contract? The experience of the past twenty-five years in railway management on both sides of the Atlantic not only answers this question emphatically in the negative, but furnishes a decisive argument in favor of the wisdom of railway amalgamation. The idea upon which the defendants' argument is based, that the public is necessarily benefited by unrestricted railway competition, was formerly held to some extent both in England and on the continent of Europe, but has long since, as is well known, been discarded there both in theory and practice. At the present time the entire railway system of England, with the exception, perhaps, of two or three short roads, is in the hands of a few large corporations. The result of this policy as compared with the old, so far as respects one of these large companies, was stated some years ago in the report of a select committee on railway amalgamation to parliament, quoted by Mr. Charles Francis Adams in his "Railroads: Their Origin and Problems," *p.* 207. "The North-Eastern Railway is composed of thirty-seven lines, several of which formerly competed with each other. Before their amalgamation they had, generally speaking, high rates and fares and low dividends. The system is now the most complete monopoly in the United Kingdom.

From the Tyne to the Humber, with one local exception, it has the country to itself, and it has the lowest fares and the highest dividends of any large English railway. It has had little or no litigation with other companies. While complaints have been heard from Lancashire and Yorkshire, where there are so called competing lines, no witness has appeared to complain of the North-Eastern, and the general feeling in the district it serves appears favorable to its management."

In France much the same system has been adopted as in England, while in Germany the working of similar ideas has already led to the purchase of most of the private railroads by the different states of the empire.

These erroneous ideas of the benefits to be derived from unrestricted railway competition, now exploded and given up throughout Europe, have at times run riot on this side of the Atlantic; but it is believed that here, also, experience has at length demonstrated their fallacy, and that the views of our best thinkers, as well as of the vast majority of our practical railroad men, are now in accord with those held elsewhere.

Assuming, then, that from the stand-point of economic science these contracts between the plaintiff and defendant corporations were in accord with sound principles of public policy; that there is no natural law by the working of which competition between railroads invariably produces benefit to the public, but that, on the contrary, its effects have ordinarily been just the reverse,—the question remains to be answered, Have courts taken a different view of the matter, erecting, as they perhaps have a right to do, an erroneous theory of political economy into a rule of law? Four cases are cited by the defendants in their brief to show that they have done so. An examination of these cases will make it evident, we think, that they furnish no authority whatever for the proposition to which they are cited.

We wish to call the attention of the court to one English case of high authority, almost precisely identical in its facts with the present. *Hare* v. *Railroad*, 2 Johns. & H. 80.

Mr. Morawetz, in his work on corporations, s. 1131, after stating the supposed doctrine that contracts in restraint of trade are illegal, and suggesting some of the limitations to which it is subject, draws a distinction between contracts in restraint of trade, and traffic arrangements between competing railroads. "Even if there were such a rule as has been claimed, applicable to competition in trade, the principle and policy of the rule would not be applicable to traffic arrangements designed merely to prevent ruinous competition and ' wars' among railroad companies. The main objection which has been urged against combinations restraining competition in trade, namely, that such combinations tend to produce monopolies and cause extortion, has no application to combinations among railroad companies, for railroad companies are prohibited by law

from charging more than reasonable rates. The conclusion upon this branch of the case must therefore be, that the contracts here attacked were not only conformable to correct ideas of railway management and sound principles of public policy as tested by experience, but also to the views of public policy which have been adopted by courts, and have come to form a part of our general system of law.

If the statute upon which the third plea is framed be critically examined, it will be very hard, we think, to find in it any such provision or prohibition with respect to the Manchester & Lawrence Railroad as to have the effect claimed,—that is, to preclude that corporation from having a fair and just settlement with the Concord road as to the matters and things in which both corporations are pecuniarily interested, arising under and growing out of the control and management by the latter corporation of the former, after its passage. As to what had already been done, the statute, of course, had no application or effect whatever. It could not and did not in any way change, modify, or alter the complexion of the previous possession, control, and management by the Concord, or of any contract under and by force of which that possession was held or claimed to be held. It did forbid the consolidation of competing roads. But so far as there was anything at all resembling consolidation, that had been done long before. It did (if it was constitutional) confer upon each of the parties power to draw back and say, "I go no further in the performance of this contract." It did authorize any citizen, whether aggrieved or not, to do what the state had the power all the while to do,—that is, apply to the court and have an order restraining the directors, officers, or agents of the Concord Railroad from enforcing or exercising the authority they were in fact exercising over the Manchester & Lawrence at the time the act was passed. It did fulminate a penalty against the directors, officers, and agents of the Concord Railroad, if they should continue to do what they were then doing. What more? Nothing. It did not say to the Manchester & Lawrence, You must, with force if necessary, regain your property and run your road yourselves. It aimed no penalty at them.

That it could not have been the intention of the legislature, by fixing a penalty upon the Concord Railroad for continuing their possession and control under a contract that was in all respects lawful when made, and lawful when the statute was passed, thereby to make an outlaw of the Manchester & Lawrence by putting them beyond the pale of legal remedies, for no other reason than that the Concord refused to obey the mandate, would seem to be a proposition so plain as to defy argument or illustration. If it had been the legislative intent to do such thing, they would have said so in language so plain that it could not be misunderstood. The penalty directed to the officers of the Concord Railroad is the only consequence of a violation of the statute which the legislature chose to

prescribe. *Philadelphia Loan Co.* v. *Towner*, 13 Conn. 258; *Pangborn* v. *Westlake*, 36 Iowa 546; *Pratt* v. *Short*, 79 N. Y. 445. Upon these considerations and authorities we confidently submit that no act or omission on the part of the Manchester & Lawrence Railroad appears here which, upon any fair interpretation of the statute, puts them beyond the pale of legal remedies.

Assuming, however, that this view is incorrect, and that the statutory prohibition had the effect of so far rendering the contracts void as to deprive the plaintiffs of the right of recovering expressly for their breach, we claim that from their performance on the part of the plaintiffs, and the acquisition under them by the defendants of property and earnings for which they have rendered no corresponding value, an obligation has resulted to make equitable compensation therefor, which under well recognized principles of law will be enforced in a proceeding of the character of the present. In this connection three decisive features of the contracts are to be noticed: 1. They have been executed on the part of the plaintiffs. 2. They were not immoral. This is not and cannot be claimed. 3. They were not contrary to public policy. This results, we think, from the considerations we have presented in examining the issue raised by the demurrer to the second plea.

This being premised, the case comes clearly within the rule stated by Mr. Morawetz, *s.* 721: "The general rule is, that if an agreement is legally void and unenforceable by reason of some statutory or common-law prohibition, either party to the agreement who has received anything from the other party and has failed to perform the agreement on his part must account to the latter for what has been so received. Under these circumstances the court will grant relief irrespective of the invalid agreement, unless it involves some positive immorality, or there are other reasons of public policy why the courts should refuse to grant any relief in the case." He adds,—" These doctrines have been applied repeatedly in suits arising out of contracts entered into by corporations, although prohibited by statute or by the common law; and, although the contracts were held illegal and unenforceable in these cases, a recovery was allowed to the extent of the consideration received."

We cite a few of the numerous cases sustaining Mr. Morawetz's statement of the law: *Pratt* v. *Short*, 79 N. Y. 437, 445; *Pratt* v. *Eaton*, 79 N. Y. 449; *Farmers' Loan & Trust Co.* v. *Railroad*, 1 M'Crary 247; *Curtis* v. *Leavitt*, 15 N. Y. 14; *Brooks* v. *Martin*, 2 Wall. 70; *Sharp* v. *Taylor*, 2 Ph. Ch. 801; *Planters' Bank* v. *Union Bank*, 16 Wall. 483, 488; *Cook* v. *Sherman*, 20 Fed. Rep. 167, 170; *W. U. Tel. Co.* v. *Railway*, 1 M'Crary 558; *Wells* v. *McGeoch*, 71 Wis. 196; *Gilliam* v. *Brown*, 43 Miss. 641, 664; *Lewis* v. *Alexander*, 51 Tex. 578, 588; *Whitney* v. *Peay*, 24 Ark. 22; *Philadelphia Loan Co.* v. *Towner*, 13 Conn. 249, 258; *Berkshire* v. *Evans*, 4 Leigh 223; *DeLeon* v. *Trevino*, 49 Tex. 88; *Pfeuffer* v. *Maltby*, 54 Tex. 454; *Am. Union Tel. Co.* v. *Railway*,

1 M'Crary 188; *Atlantic & P. Tel. Co.* v. *Railway*, 1 M'Crary
541; *W. U. Tel. Co.* v. *Railway*, 3 M'Crary 130; *Tenant* v. *Elliott*,
1 B. & P. 3.

*O. E. Branch*, for the plaintiffs.

The defence raised by the second plea is in substance that the
contracts referred to were entered into for the purpose of prevent-
ing and destroying, and did prevent and destroy, competition.   As
a proposition of law, we submit that this plea is bad on demurrer,
because (1) it does not allege that the purpose or intent of the
contracts was to prevent and destroy fair competition between the
roads; (2) it does not allege that they did in fact prevent and
destroy fair competition; (3) it does not allege that by the making
and carrying out of said contracts the rates of freights and fares
were made unreasonably or unnecessarily high; (4) it does not
allege that the making and carrying out of said contracts violated
a duty which the parties owed to the state.

The proposition, that any and all contracts between railroad
companies which prevent competition are void at common law, or
upon grounds of public policy, cannot be sustained upon principle
or authority.   Competition may result in good to the public.   It
may also result in great injury to the public as well as to stock-
holders.   The state has no interest in railroad competition *per se*,
but only so far as it establishes just and reasonable rates.   Rival
or competing railroads are under no obligation, express or implied,
to do more than non-competing roads, to wit, to furnish the public
adequate transportation facilities at reasonable rates.   If these are
furnished, no maxim of the common law, no principle of public
policy, is violated by any contracts which the companies may have
made.   No duty to the public, no benefit to which the public is
entitled, is in any degree impaired by agreements between railroad
companies which prevent such competition as would reduce charges
below reasonable rates.   On the contrary, such contracts are legiti-
mate measures for the protection of the property rights of stock-
holders, and the permanent good of the public.

The first plea raises directly the question whether an account-
ing can be compelled in transactions completed under contracts
that are *ultra vires* of the chartered powers of the companies.   The
second plea, if it can be considered at all, and the third plea also,
interpose, as a defence to the relief prayed for, statutory and com-
mon-law prohibitions of the contracts set forth in the bill.   In
effect, however, they raise nothing more than the defence of *ultra
vires*, since any corporate act not authorized by charter or statute
is *ultra vires*, for the reason that it is forbidden by the common
law, any special statutory prohibition being only a distinct legisla-
tive reaffirmance of a preëxisting rule of the common law.   Mor.
Corp. (2d ed.), *ss.* 648, 649, 658.

The state is concerned in the transactions of railroads and railroad companies only so far as they involve public relations and duties; but so far as those transactions affect the private rights and property of the stockholders the state has no more concern than it has in any other private property. *Chicago, etc , R. R. Co.* v. *Att'y Gen.*, 9 West. Jur. 347; *Railroad Com.* v. *Portland & O. C. R. R. Co.*, 63 Me. 277; *Olcott* v. *Supervisors*, 16 Wall. 678; *Secombe* v. *Railroad*, 23 Wall. 108. The rights and remedies of the state and the public as against railroad corporations rest upon the special interest which they have in their public use. The rights and remedies of the stockholders rest upon the interest which they have in the private property invested in them. The rights and remedies of the corporations themselves are such only as are indispensable to the preservation of the duties they owe to the state, the public, and the stockholders. Railroad corporations are not created for their own advantage. No rights or privileges are conferred upon them, no immunities are granted them, for their original, primary benefit, but rather for the benefit of those whom they serve. Therefore, the allegation by a railroad corporation that a contract or a transaction is *ultra vires* has substantial legal or equitable significance in so far as it implies the violation of rights of which it may properly complain. The common-law prohibition of contracts between railroad companies, for the lease, use, or operation of their roads, obtains for the actual or potential benefit of the state only. *Goundie* v. *Company*, 7 Pa. St. 233; *Union Nat. Bank* v. *Matthews*, 98 U. S. 628; *Gold Mining Co.* v. *Bank*, 96 U. S. 640. The statutes of the state, enabling them to make such contracts for a limited time, removed the prior disability they were under at common law to do this, or enlarged to that extent their authorized powers of corporate action; but the provisions of those statutes making such contracts legal and binding for a period of five years, and the subsequent statute of 1867 prohibiting certain roads from operating competing lines, with penalties attached for its violation, did not in the slightest degree limit or lessen any powers which before the companies might have exercised lawfully, any right which before they possessed. Nor did they give to such contracts any greater degree of invalidity or illegality than they had at common law. They might have declared them void: that would have changed the remedy merely.

The authorities cited by the defendants' counsel (4 N. H. 285, 5 N. H. 396, 41 N. H. 256, 268, 269, 28 N. H. 379, 384) do not sustain their position, nor do they in any way conflict with the views here expressed. True, contracts made in violation of a penal statute are impliedly illegal; it is also true that if it is necessary to declare such contracts void in order to give effect to the statute, the courts will declare them void. But an illegal contract is not a void contract; and no sound reason can be given why it is necessary to hold that contracts which violate the statute of 1867 are

void in order to prevent one competing road from running another, and to make liable to indictment and fine those who attempt it, or in order to stop by injunction the evil which the statute meant to prevent. "A contract expressly prohibited by statute cannot, as a rule, be enforced. However, the intention of the legislature is controlling, and a contract will not be treated as void on account of a provision in a statute unless this be necessary in order to give effect to the law according to its meaning." Mor. Corp. (2d ed.) ss. 657, 658; *Whitney* v. *Peay*, 24 Ark. 22; *Vanatta* v. *Bank*, 9 Ohio St. 27; Mor. Corp. (2d ed.) ss. 651, 666.

Our position is, (1) that the contracts were not made void by any statute, either expressly or by necessary implication; (2) that they were illegal only in that they were unauthorized by the state, their illegality arising out of their breach of the stockholders' partnership agreement having been waived; (3) that the parties themselves having carried out the contracts, the fact that they were not authorized by the state is something of which the state only may complain. We say further, (4) that whether the contracts were illegal merely, or wholly void, the court may in its discretion grant the relief demanded; and (5) that such relief will be granted unless considerations of public policy are so peremptory and overmastering as to constrain the court to refuse. *National Pemberton Bank* v. *Porter*, 125 Mass. 333; Bri. Ult. V. (2d Eng. ed.), 769, 814; *Eastern Counties Railway Co.* v. *Hawkes*, 5 H. L. C. 333, 371.

We are aware that in some of the earlier reported decisions, in which the question of *ultra vires* was involved, there was conflict of opinion; but we confidently submit that the principle has now become substantially settled by the later leading and more carefully considered decisions, that whenever a corporation has explicitly or impliedly ratified a transaction *ultra vires*, it will not be permitted to set up its want of authority to engage in it, so far as completed, unless it be something which public policy or the law condemns as absolutely void. Ratification, evidenced by the acceptance by all the stockholders of the benefits of the contract, or which is conclusively implied by their acquiescence in it, or which is established by their votes, estops them and the corporation from alleging that the consummated operations of the parties thereunder were beyond their authorized corporate powers.

But ratification, as applied to a corporation, imports an act done without authority, an overstepping of delegated powers, that is, the relation of principal and agent. Therefore, when the defendant would be held liable or accountable under the agreement upon the common-law principles of agency, the fact that it is a corporation, and as such is invested with but limited authorized powers, must yield to the legal and equitable obligations which arise out of this relation of principal and agent. It would be a "legal wrong" to permit the principal to avoid obligations to third parties which

the law imposes upon him by reason of his ratification of an unauthorized act of his agent.  Whenever it appears that a corporation, but for its corporate limitations, would, upon principles of agency, be liable for the results of a transaction, the law says, You shall not be permitted to allege your want of power to enter into the transaction, for the purpose of avoiding that liability; you shall not make your legal infirmity a source of strength; having voluntarily abandoned the protection which the law has thrown around you, you will not be permitted afterwards to fly to it as a refuge, nor to claim in your emergency the benefit of those considerations of public policy and of those rules of law which are established for the protection and benefit of the state.  Mor. Corp. (2d ed ) *s.* 581.  There is nothing about a corporation that should make it an object of special regard by the courts.  Its contractual disabilities are in no sense extraordinary.  It certainly is not liable to be overreached or imposed upon so that there ought to subsist between it and the law the relation of ward and guardian.  And if the *ultra vires* contracts of an agent are binding if ratified; if the *ultra vires* contracts of infants are voidable only. and are binding if ratified; if the voidable contracts of natural persons cannot be avoided except the parties are placed *in statu quo*,—for analogous reasons the *ultra vires* contracts of a corporation are conclusive so far as ratified, and if they may be avoided, it is only upon the condition of equal, exact justice being done to all parties.

"After a partnership confessedly against public policy has been carried out, and the money contributed by one of the partners has passed into other forms,—the results of the contemplated operation completed,—a partner in whose hands the profits are cannot refuse to account for and divide them on the ground of the illegal character of the original contract."  *Brooks* v. *Martin*, 2 Wall. 70; *Brandeis* v. *Neustadtl*, 13 Wis. 154; *Madison Ave. Baptist Church* v. *Baptist, etc., Church*, 73 N. Y. 82; *Bradley* v. *Ballard*, 55 Ill. 413; 2 Kent Com. (11th ed.) 381, *n.*; *Zabriskie* v. *Railroad*, 23 How. 381; *Cary* v. *Railroad*, 29 Barb. 35; *Argenti* v. *San Francisco*, 16 Cal. 255; *McCluer* v. *Railroad*, 13 Gray 124; *Hale* v. *Fire Ins. Co.*, 32 N. H. 295.

" Where plaintiff, a corporation, seeks an accounting from defendant of an executed partnership transaction, defendant cannot set up that a partnership transaction was *ultra vires*, under plaintiff's charter."  *Standard Oil Co.* v. *Scofield*, 16 Abb. New Cas. 372.  In *Western Union Tel. Co.* v. *Railway*, 1 M'Crary 562, the court said,—" There is another ground upon which I should feel constrained to hold that the plaintiff has, by the amended bill, shown an interest in the telegraph lines and property in controversy which a court of equity should protect.  Even if we assume the contract is void, the property accumulated or constructed under it must, as between the parties, be disposed of according to equity, and the court will not refuse to deal with that property on the

ground that it was acquired under an illegal contract.    Such is the doctrine established by the supreme court of the United States." In *Western Union Tel. Co.* v. *Railway*, 1 M'Crary 570, the court said,— "If the defendants, after years of acquiescence in the contract in question, after receiving its benefits, and after a property had been built up under it to which others made claim, became suddenly convinced that it was a void contract, it was their duty to apply to the courts for relief, praying a cancellation of the contract, and a full and fair settlement of all accounts growing out of its execution in the past.    Until they seek some such remedy, and until a fair settlement upon full accounting can be had, they will be enjoined from attempting to eject the plaintiff, or to seize the property."

The doctrine in these cases was afterwards applied and affirmed in *Telegraph Co.* v. *Railway*, 3 M'Crary 130.    "The commonwealth alone can object to a want of capacity in a corporation to hold land which it was not authorized by its charter to purchase." *Goundie* v. *Northampton Water Co.*, 7 Pa. St. 233; *Ayers* v. *Banking Co.*, 3 L. R. P. C. 559.    In *Cook* v. *Sherman*, 20 Fed. Rep. 170, it was said, referring to *Brooks* v. *Martin*, *supra*,— "According to this rule, the question in such cases must always be, Can the plaintiff maintain his action without enforcing the illegal contract? or, in other words, Has he a cause of action independently of the illegal contract?    If it appears that the defendants in a given case have received money or property from the complainants, and which belongs to the latter, the same may be recovered without any inquiry into the nature of the contract under which such money or property was acquired.    The distinction is between enforcing an illegal contract, and asserting title to money and property which has arisen from it."    *Tenant* v. *Elliott*, 1 B. & P. 3; *Farmer* v. *Russell*, 1 *id.* 296; *Thomson* v. *Thomson*, 7 Ves. 470; *McBlair* v. *Gibbes*, 17 How. 232; Mor. Corp. (2d ed.) *s.* 721; *Manville* v. *Belden Mining Co.*, 17 Fed. Rep. 425; *Newcastle Northern R. Co.* v. *Simpson*, 23 Fed. Rep. 214; *Salt Lake City* v. *Hollister*, 118 U. S. 263; *Thomas* v. *Railroad*, 101 U. S. 71; *Louisiana* v. *Wood*, 102 U. S. 294; *Chapman* v. *Douglas County*, 107 U. S. 348, 355.    "In respect to offences in which is involved any moral delinquency or turpitude, all parties are deemed equally guilty, and the courts will not inquire into their relative guilt.    But where the offence is *malum prohibitum*, and is in no respect immoral, it is not against the policy of the law to inquire into the relative delinquency of the parties, and to administer justice between them, although both parties are wrongdoers."    *Lowell* v. *Railroad*, 23 Pick. 32; *Spring Co.* v. *Knowlton*, 103 U. S. 49; *Sampson* v. *Shaw*, 101 Mass. 145, 150; 2 Chit. Con. (11 Am. ed.) 976; *Lestapies* v. *Ingraham*, 5 Pa. St. 71, 81; *Northampton County's Appeal*, 30 Pa. St. 305.

It is said by the defendants' counsel, in their brief, that to "invoke the aid of the court to adjust controversies arising out of

such prohibited and illegal action, is to say that the court will punish such illegal action with one hand while with the other it apportions the result of it between the guilty parties." Granted: but is the arm of equity shortened because the hand of the law falls on the offending? Because "the officers or agents" of the defendants might once have been punished by fine for carrying on the transactions disclosed in the bill, furnishes no reason why one of the defendants should be allowed to retain in their possession the property of the plaintiffs. On the contrary, the only way in which a corporation may be made to suffer for violating the statute (unless the doubtful policy of revoking its charter is adopted) is by compelling it to restore what it has unlawfully obtained, since, as will be observed, corporations themselves are not subject to any penalty whatever under the statute. Again: It is said that "relief is not granted in equity where both parties are truly *in pari delicto*, unless in cases where public policy would thereby be promoted." But we contend public policy would be promoted by compelling the plaintiffs herein to account. It would establish the rule that a corporation cannot violate the statute and escape all liability. A contrary rule would be a declaration that the statute may be absolutely and defiantly transgressed by a railroad corporation, with no adverse consequences following, unless by some possibility its agents are subjected to fine. If the state during the long period when these transactions were going on was not enough prejudiced or concerned to interfere and stop them, if public policy was not at the time to be promoted by enjoining their continuance, we are unable to discern how public policy, which is only another name for the public good, would be promoted now in any degree by permitting the defendants to bear off the entire assets of the illegal partnership after the transactions are completed, and their results, good or bad, so far as they concern the state or the public, are beyond change or recall.

It requires no argument to prove that the public can in no way be affected by the result of this suit; that they have no more at stake in it than they have in the legal controversies of private citizens. Nor can it be said that the refusal of the court to adjust the differences between the parties would add anything of vigor or efficiency to the statute in the future. It would, instead, offer inducements to those who would break it, and protection for successful violations of it, and would stimulate each party to overreach the other. The defence of *ultra vires*, except when interposed in actions to enforce specific performance of illegal, executory contracts, is at best sinister, evasive, and essentially dishonorable. It will never circumscribe the limits of the salutary and beneficent principles of equity. Whatever merit it has is the property of the court. It will be made use of by the court whenever in their discretion substantial justice will be advanced, but never to sustain a legal or moral wrong. Mor. Corp. (2d ed.), *s.* 721, *n.* 1.

We ·submit that the facts bring the present case far within the rules laid down in the foregoing cases, and that the defendants must account to the plaintiffs for the benefits received.   Nor can it be said that to compel an accounting between these parties would be an attempt by the court to make valid contracts which the law condemns as invalid, and to legalize transactions which are by law illegal.   On the contrary, to compel the defendants to restore to the plaintiffs their share of the large property which the defendants have in their possession is simply placing the parties *in statu quo*, the contracts themselves only serving as data by which the court may be guided in determining what the equitable interests of the parties are.   As was said in *Davis* v. *Railroad*, 131 Mass. 258, 275, "A corporation may indeed be bound to refund to a person, from whom it has received money or property for a purpose unauthorized by its charter, the value of what it has actually received; for in such a case to maintain the action against the corporation is not to affirm, but to disaffirm, the illegal contract."   *White* v. *Franklin Bank*, 22 Pick. 181 ; *Morville* v. *Am. Tract Soc.*, 123 Mass. 129, 137 ; *Atlantic & Pac. Tel. Co.* v. *Railway*, 1 M'Crary 548.   If the plaintiffs are entitled to an accounting from the defendants, as we claim, it follows that they are entitled to a·discovery of the matters specified in the bill.   This, we understand, is conceded by the defendants' counsel in their brief, unless some or all of the other objections urged by them are good

To the third objection we reply, that the defendant corporation is asked to make discovery, and that the statute of 1867 imposes no penalty whatever upon a corporation, but upon its "directors, officers, or agents."   True, a corporation must make discovery through its agents or servants ; but it ·does not appear by any of the pleadings that any of the present or future "directors, officers, or agents" of the Concord road, who may be called upon to answer, are those who were concerned in violating, or attempting to violate, the act.   Furthermore, Gen. Laws, *c*. 266, *s*. 10, provides that "all prosecutions founded upon any penal statute, which are wholly or in part for the use of the prosecutor, shall be brought within one year ;. and all other suits and prosecutions thereon within two years after the commission of the offence, unless otherwise specially provided."   The transactions of this case ended, as appears by the bill, July 1, 1887.   We therefore contend that when it shall appear that the directors, officers, or agents of the defendants, who may be called to make the discovery asked, might have been in fact guilty of violating the statute, and may be, at the time when interrogated, liable to the penalty it imposes, then only can the objection be made available by them.

*J. H. Benton, Jr.*, orally, for the defendants.

Stated concisely, the case here is this: Two railroad corporations whose lines of road compete with each other, each corpora-

tion being bound by its charter to maintain and operate its road independently of the other, make a contract to operate them together as one road, for the purpose of destroying and preventing the competition by which prices are, and but for the operation of the roads together under such contracts would continue to be, materially reduced, and thereby create a monopoly in transportation upon the two roads. It is beyond dispute that neither of the parties to such a contract can maintain any suit against the other, either for the specific performance of the contract or for damages for its non-performance. So much results from the mere fact that the contract is *ultra vires* each corporation. The only question is, whether, if the corporations perform the contract wholly or in part, either can maintain a suit against the other to adjust the business done under it. The defendants submit that they cannot, and, upon the branch of their case discussed in this argument, rely upon two primary propositions: 1. That these contracts being, as is admitted by the pleadings, " wholly beyond the power of the plaintiffs and defendants, or either of them, to make or to ratify,"—*i. e.*, contracts which both of the parties were prohibited by the common law to make, so that they could not have been made lawful by the assent of all the shareholders of both corporations,—they do not constitute a title upon which either party can have any remedy against the other. 2. That the contracts being made, as is admitted by the pleadings, for the purpose of destroying and preventing competition by which rates to the public were reduced, and but for the contracts would have continued to be reduced, on two rival and competing roads established by the state for the purpose of being independently operated, with the competition and reduction of rates to the public consequent upon such independent operation, they were contrary to public policy and illegal as creating a monopoly and contravening the manifest purpose of the acts of the legislature creating the plaintiff and defendant corporations, and therefore neither party can have any aid from the judicial department of the state in respect to anything done under them.

As to the first proposition: What is the character of these so called contracts under the charters of the parties? They are not contracts made in the abuse of a general power in a particular instance, the abuse not being known to the other contracting party, as, for instance, in the case of a promissory note given by a corporation which had no authority to give a note for the purpose for which that was given, although authorized to give notes for some purposes; and in general, in all cases where the question of corporate power depends not merely upon the law under which the corporation acts, and of which all persons dealing with it must be presumed to have knowledge, but upon the existence of certain extrinsic facts, resting peculiarly within the knowledge of the corporation, in which cases the corporation is estopped from denying that which, by assuming to make the contract, it has virtually

affirmed, as in *Monument Nat. Bank* v. *Globe Works*, 101 Mass. 57, *Zabriskie* v. *Railroad*, 23 How. 381, *Cochecho Nat. Bank* v. *Haskell*, 51 N. H. 116, *Peterborough R. R.* v. *Railroad*, 59 N. H. 385.

They are not contracts which were made by agents of a corporation held out by it as having authority to act for it in such a manner, and whom the plaintiffs were induced by the conduct of the corporation to believe had power to make such contracts, as in *N. Y. & New Haven R. R.* v. *Schuyler*, 34 N. Y. 30, *Faneuil Hall Bank* v. *Bank*, 16 Gray 534, *Merchants' Bank* v. *State Bank*, 10 Wall. 604. They are not contracts under which a corporation has transferred property or lent money to the other party to the contracts, who seeks to retain the money or the property and still avoid payment, upon the ground that the corporation had no power to make the contracts, as in *Ossipee, etc., Mfg. Co.* v. *Canney*, 54 N. H. 295, 312, *Chester Glass Co.* v. *Dewey*, 16 Mass. 94, *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62, *Steam Navigation Co.* v. *Weed*, 17 Barb. 378, *Union Nat. Bank* v. *Matthews*, 98 U. S. 621, *Silver Lake Bank* v. *North*, 4 Johns. Ch. 370, *Gold-Mining Co.* v. *Bank*, 96 U. S. 640, *Nat. Bank* v. *Whitney*, 103 U. S. 99. In such cases the defendant, by contracting with the corporation and retaining what he has received under the contract, may be estopped to deny the corporate existence of the plaintiffs and their power to make the contract. *Cong. Society* v. *Perry*, 6 N. H. 164; *Worcester Med. Institution* v. *Harding*, 11 Cush. 285; *Dutchess Cotton Manufactory* v. *Davis*, 14 Johns. 238.

But a corporation, by making and performing a contract "wholly beyond its power to make or to ratify, is not estopped to deny its capacity to make or ratify the contract." The doctrine of estoppel does not apply to such cases. If it did, the result would be that no matter how limited the design and the powers of the corporation might appear in its charter, it would be practically a corporation without limit as to its powers. *Penn., etc., Co.* v. *Dandridge*, 8 G. & J. 248, 319. And the distinction is obvious between cases where a defendant has received property from the plaintiffs upon a contract which was *ultra vires* the plaintiffs only, and a case like the one at bar, where the contract was *ultra vires* the defendants. A defendant may be estopped to set up the plaintiff's lack of power, but its own lack of power to make the contract cannot be supplied by estoppel. Legal capacity cannot be given, or enlarged, by estoppel. If it could, all the limitations which the law places upon the acts of corporations, or of infants or married women, could be practically dispensed with by their simply doing the acts which they have not the capacity to do. *Lowell* v. *Daniels*, 2 Gray 161, 168; *Farmington Nat. Bank* v. *Buzzell*, 60 N. H. 189; *Penacook Savings Bank* v. *Sanborn*, 60 N. H. 558; *Merriam* v. *Railroad*, 117 Mass. 241, 244; *Loan Association* v. *Topeka*, 20 Wall. 655, 667.

They are not contracts where the plaintiffs were in any way ignorant of the defendants' lack of power to make them, or were in any way deceived or misled in the matter by the conduct of the defendants, or contracts under which the plaintiffs have parted with any specific property which they can trace. They are simply contracts which the plaintiffs, knowing that they had no power to make, and that the defendants had no power to make,—*i. e.*, knowing that both they and the defendants were prohibited by law from making,—knowingly and wilfully made in violation of law. They are contracts wholly beyond any purpose for which the contracting parties had by their charters power to contract, wholly null and void in their inception, and which could not have been ratified by the consent and action of every member of each of the corporations parties to them. They are contracts prohibited by the charters of the parties as much as though prohibited by the express language thereof. The enumeration of the powers granted to the corporation implies the exclusion and prohibition of all others. *Thomas* v. *Railroad*, 101 U. S. 71; *Ashbury R'y Carriage & Iron Co.* v. *Riche*, L. R. 7 H. L. 689; *Attorney-General* v. *Railway*, L. R. 5 App. Cas. 473, 481; *Norwich* v. *Railway*, 4 E. & B. 397, 414; *People* v. *Utica Ins. Co.*, 15 Johns. 358, 383; *Firemen Ins. Co.* v. *Ely*, 2 Cow. 678; *Crocker* v. *Whitney*, 71 N. Y. 161, 167. " Contracts of railway companies, and corporations of a like public nature, which can be seen to support a substantial contravention of the policy of the incorporating acts, are held by the courts to be void, and are often spoken of as *mala prohibita* and illegal in the same sense as the contract of a natural person to do anything contrary to the provisions of the acts of parliament is illegal." Pol. Con. 125, citing *Taylor* v. *Railway*, L. R. 2 Ex. 379, *Riche* v. *Ashbury R'y Carriage Co.*, L. R. 9 Ex. 262, 266, (*S. C.*) *Ashbury R'y Carriage Co.* v. *Riche*, L. R. 7 H. L. 689. The term *ultra vires* can properly be applied only to acts which are wholly beyond the power of the corporation to make and to ratify. It has been used, however, in a secondary sense, as meaning acts which are simply beyond the power of the majority of the shareholders to do, so that when an act is said to be *ultra vires* a corporation, it may be meant that it is an act which cannot be done with the consent of all the shareholders, or that it is an act which a majority of the shareholders cannot bind dissentient shareholders by. *Earl of Shrewsbury* v. *Railway*, L. R. 1 Eq. 618. It is sometimes used also in a third sense, as meaning beyond the powers of the directors or officers of the corporation. It is this twofold, and sometimes threefold, use of the term which has caused much of the confusion and apparent contradiction in the decided cases. Substantially all the cases in which corporations have been charged upon so called *ultra vires* contracts, have been cases of the second or third class, that is to say, cases where the shareholders, by unanimous action—or silence, which is equivalent in such cases to action—have assented

to and confirmed the act.   In the primary sense of the term, *ultra vires* acts are against public policy and illegal, and the corporation cannot be estopped by anything done under them.   The distinction between the primary and secondary meaning is well stated in *Hazlehurst* v. *Railroad*, 43 Ga. 13, *Miners' Ditch Co.* v. *Zellarbach*, 37 Cal. 543, 579, *Hood* v. *Railroad*, 22 Conn. 1, (*S. C.*, 23 Conn. 609), *Smith* v. *Ins. Co.*, 4 Ala. 558, *Montgomery* v. *M. & W. Plank Road Co.*, 31 Ala. 76, *Littlewort* v. *Davis*, 50 Miss. 403, *Natchez* v. *Mallery*, 54 Miss. 499, *Orr* v. *Lacey*, 2 Doug. Mich. 230, *Willson* v. *Owen*, 30 Mich. 474, *Germantown Ins. Co.* v. *Dhein*, 43 Wis. 420, *Rochester Ins. Co.* v. *Martin*, 13 Minn. 59, *McPherson* v. *Foster*, 43 Iowa 48.

The primary defect in the plaintiffs' title in this case is, that by its demurrer to the defendants' first plea they admit that the contracts which their bill sets up as their title to recover against the defendants were " wholly beyond the power of the defendants to make or to ratify," *i. e.*, are not contracts at all.   And, as every person who contracts with a corporation is bound at his peril to take notice of the legal limits of its capacity, the plaintiffs' title to recover is, upon their own showing, contracts which are no contracts, and which they knew were no contracts when they assumed to act under them.   More than this, the demurrer also admits that these contracts were " wholly beyond their own power to make or to ratify ; " so that upon the record they state their only title to be certain contracts between them and the defendants which they knew were no contracts, and could not be made contracts by any action of both parties thereunder.

These contracts were as much beyond the power of the parties, as much forbidden to them, as the business of manufacturing or banking or insurance or brewing, or speculating in lands or stocks, or dealing in flour or grain, or any other article of traffic as merchandise.   If an accounting can be had upon the basis of them, an accounting could be had upon the basis of contracts to do any or all of these kinds of business, or to do anything which any private person could do.   In short, if a corporation can be held to an accounting upon a contract of partnership which it " has no power to make or to ratify," because it goes on under the contract and transacts the business which it has no power or right to transact, it may and ought equally to be held upon a contract to guarantee the results of that business, if done by others.   The test of the liability of a corporation upon a contract is not whether it has acted under it, but whether it had power to make it: if it had not, and the other party knew that it had not, to hold it liable upon it because it goes on and acts under it, is practically to remove all possible limit to corporate action, and to take the doctrine of *ultra vires* out of the law.

That no recovery can be had upon such a title as the plaintiffs here set up was settled by an express and well considered decision

of this court in *Downing* v. *Mt. Washington Road Co.*, 40 N. H. 230, in 1860. And such is the well settled law in the English courts, the United States supreme court, and in substantially all courts of authority in the United States. *Pearce* v. *Railroad*, 21 How. 441 (decided in 1858). In 1879 the supreme court of the United States, in *Thomas* v. *Railroad*, 101 U. S. 71, reviewing the authorities up to that time, and answering the contention of counsel that the defence of *ultra vires* could not be made to an action against a corporation upon a contract in which all its shareholders had acquiesced, and which had been performed, affirmed the doctrine of *Pearce* v. *Railroad*, and held that the decision of the House of Lords in *Ashbury R'y Carriage Co.* v. *Riche* represents the " decided preponderance of authority both in this country and in England, and is based upon sound principle."

Is it not obvious that in this case the Manchester & Lawrence Railroad, by the contract set forth in the bill, substantially abandoned the performance of their public functions, and turned over the operation of their road without authority of the legislature to the Concord Railroad Corporation, so that the very contracts upon which they count were contracts in and by which they violated their contract with the state, and are illegal and void as against public policy for that reason alone? The state delegated to the plaintiffs the power to exercise the right of eminent domain because they were a public agent for the purpose of establishing a public railroad highway to be operated according to the terms of their charter, that is, as an independent line of road, necessarily competitive with that of the Concord Railroad; and the contracts by which they destroyed and prevented such competition and practically united their road with that of the Concord Railroad Corporation, making them in effect one road, were a direct violation of the trust upon which they received the power to take their right of way under the exercise of the power of eminent domain. Can it be necessary to argue that such a contract, conceded to be a violation of the terms of the trust upon which the state gave the control of this public highway to the plaintiffs, is against public policy and illegal, and one which the courts will not enforce? Following these cases, the supreme court of Massachusetts, in *Davis* v. *Railroad*, 131 Mass. 258, in 1881, held that an action could not be maintained against a railroad corporation upon an *ultra vires* contract of guaranty of the expenses of a musical festival, although the contract was made with a reasonable belief that the holding of the festival would be of great pecuniary benefit to the corporation by increasing its proper business, and the festival had been held and expense incurred in reliance upon the guaranty. In this case Mr. Justice *Gray* reviewed all the leading English and American authorities, including *Union Nat. Bank* v. *Matthews*, 98 U. S. 621, cited by the plaintiffs in this case, and a similar decision of the United States supreme court in *Nat. Bank* v. *Whitney*, 103 U. S. 99.

[Counsel here reviewed at length the decisions cited by the plaintiffs' counsel in their brief upon this branch of the case, and claimed that with but one exception (by a divided court) they failed to support the plaintiffs' contention in this case.]

As to the second proposition: These contracts, which the plaintiffs count upon and seek the aid of the court to enforce, are not only contracts which the parties had no power to make, and which were in effect no contracts, and incapable of ever being made contracts by any action of either of the parties or by all the shareholders of either of the parties to them, but they are contracts which it is conceded were made for the purpose of preventing competition and thereby creating a monopoly, and are thus not only prohibited by the common law and the charters of the contracting corporations in the sense of being *extra vires*, and contrary to the intention of the legislature, but are also contrary to public policy and illegal in themselves. These contracts are illegal, not simply because they are *ultra vires*, but because they were intended to create, and did create, a monopoly, and are therefore illegal as contrary to public policy. They are contrary to public policy as creating a monopoly, and directly injurious to the interests of the public. Can such contracts be enforced by an accounting under them? A contract between two or more private persons to destroy competition and create a monopoly in transportation is contrary to public policy and illegal, precisely as a contract to destroy competition and create a monopoly in any business affecting the sale of staple commodities or articles of prime necessity. No action can be maintained to enforce such a contract specifically, or to recover damages for its non-performance; and there is no middle ground between a contract which can be enforced by a suit for specific performance (if it is of a character requiring specific performance) or by a suit for damages for its non-performance, and a contract which cannot be thus enforced. Either such a contract is good and can be thus enforced, or it is bad and it cannot be enforced, either by a suit for specific performance or for damages, or by a suit for an accounting as to business done under it. There can be no partnership in an illegal transaction. There can be no accounting where there is no partnership. These contracts were plainly illegal and void, and neither party has any right to ask the court to interfere against the other upon the footing of them. Indeed, they are so clearly contrary to public policy and illegal, that it would be the duty of the court to decline to enforce them by a judgment for damages for the non-performance of them, or by ordering an accounting to adjust what has been done under them, if that objection was not urged by the defendants. *Oscanyan* v. *Arms Co.*, 103 U. S. 261; *Cardoze* v. *Swift*, 113 Mass. 250; *Dunham* v. *Presby*, 120 Mass. 285, 289; *Evans* v. *Richardson*, 3 Meriv. 469.

This action is not an attempt by the plaintiffs to disaffirm the illegal contracts, and retrace their steps and recover some specific thing which has passed into the hands of the defendants under the contract, as in *Spring Co.* v. *Knowlton*, 103 U. S. 49, and similar cases. The illegal purpose of the contract has been accomplished: competition has been destroyed, reduction of rates has been prevented, and an absolute monopoly against the interests of the public, and in contravention of the plain purpose of the legislature, has been maintained for more than thirty years under the very contracts which the court is now asked to enforce. The plaintiffs state the illegal contracts as their title to recover, and they can make out their case only through the medium and by the aid of the illegal contracts and transactions thereunder, to all of which they were themselves a party with the defendants. The plaintiffs and defendants are therefore *in pari delicto*. *Simpson* v. *Bloss*, 7 Taunt. 246. The recovery sought is upon the basis of the illegal thing which the contracts contemplated having been done, and the effect of a recovery would be to enable the plaintiffs to realize the fruits of the illegal act by enforcing the performance of the illegal contract. By the use of every means which wealthy corporations, controlling important lines of railroad and enjoying large revenues from the possession of valuable public franchises, can use, the parties to these contracts have, under their provisions, violated their charters, violated the common law, and wilfully refused to perform their public duties for more than a generation; and from April, 1872, to July, 1887, they accomplished their illegal purposes under these contracts in defiance of the decree of this court. It is to an adjudication upon controversies arising out of this course of conduct that the court is invited by the plaintiffs. The plaintiffs and the defendants differ in the division of the fruits of their illegal combination and conduct, and the plaintiffs ask you to bring the functions of your high office to the decision of their disputes. The soundest principles of public policy, the plainest rules that regulate the administration of justice, require you to decline

In reference to all acts or contracts which are unlawful because they are hostile to public policy, the parties are regarded as being *in pari delicto*, and in all such cases the rule of law is *potior est conditio defendentis*. Parties who pay money or transfer property under contracts contrary to public policy are regarded as not being within the protection of the law, and as not being entitled to redress by the aid of the courts of justice, like other parties who are left to suffer the consequences of any pecuniary loss brought upon them by their ill conduct without any redress as against each other. It is well settled, that in reference to all acts or contracts which are unlawful on account of their immorality or their tendency to promote it, or because they are hostile to public policy, the parties thereto are regarded as being *in pari delicto*, and neither can recover against the other upon the basis of the

contract, or for any money or property which has passed from one to the other under and according to the provisions of the contract.

[Counsel then cited and commented upon many of the cases. previously cited by counsel upon both sides and upon the following: *Weeks* v. *Hill*, 38 N. H. 199; *Babcock* v. *Thompson*, 3 Pick. 446; *Seidenbender* v. *Charles*, 4 S. & R. 151, 173; *Ohio Life Ins. and Trust Co.* v. *Merchants' Ins. Co*, 11 Humph. 1, 11; *Allen* v. *Deming*, 14 N. H. 133, 140; *Fuller* v. *Dame*, 18 Pick. 472, 483; *Case* v. *Gerrish*, 15 Pick. 49; *Trumball* v. *Tilton*, 21 N. H. 128; *Blasdel* v. *Fowle*, 120 Mass. 447; *Tirrell* v. *Freeman*, 139 Mass. 297; *Favor* v. *Philbrick*, 7 N. H. 326, 340; *Newburgh* v. *Galatian*, 4 Cow. 340; *Sayles* v. *Sayles*, 21 N. H. 312; *Smith* v. *Townsend*, 109 Mass. 500; *Farnsworth* v. *Hemmer*, 1 Allen 494; *Guernsey* v. *Cook*, 120 Mass. 501; *Woodruff* v. *Wentworth*, 133 Mass. 309, 314; *Holcomb* v. *Weaver*, 136 Mass. 265; *Atlee* v. *Fink*, 75 Mo. 100; *Byrd* v. *Hughes*, 84 Ill. 174; *Phippen* v. *Stickney*, 3 Met. 384; *Gibbs* v. *Smith*, 115 Mass. 592; *Bellows* v. *Russell*, 20 N. H. 427; *Huntington* v. *Bardwell*, 46 N. H. 492; *Walker* v. *Osgood*, 98. Mass. 348; *Rice* v. *Wood*, 113 Mass. 133; *Railroad Co.* v. *Lockwood*, 17 Wall. 357; *Alger* v. *Thacher*, 19 Pick. 51; *Taylor* v. *Blanchard*, 13 Allen 370; *Eastern Ex. Co.* v. *Meserve*, 60 N. H. 198; *Frost* v. *Belmont*, 6 Allen 152; *Marshall* v. *Railroad*, 16. How. 314, 336; *Hunt* v. *Frost*, 4 Cush. 54; *White* v. *Hunter*, 23 N. H. 128; Red. R. R., s. 15, p. 45; *Low* v. *Railroad*, 45 N. H. 370, 376; *Sampson* v. *Shaw*, 101 Mass. 145; *Bishop* v. *Palmer*, 146 Mass. 469, 474; *White Mts. R. R.* v. *Eastman*, 34 N. H. 124; *Nickerson* v. *English*, 142 Mass. 267, 272; *Crawford* v. *Wick*, 18 Ohio St. 190; *Western Union Tel. Co.* v. *American Union Tel. Co.*, 65 Ga. 160; *Western Union Tel. Co.* v. *Railroad*, 86 Ill. 246; *West Va. Trans. Co.* v. *Pipe Line Co.*, 22 W. Va. 600, 627; *Sayre* v. *Association*, 1 Duv. 143; 3 Chit. Cr. L. 1139; *Morris Run Coal Co.* v. *Barclay Coal Co.*, 68 Pa. St. 173; *Hooker* v. *Vandewater*, 4 Denio 349; *People* v. *Fisher*, 14 Wend. 9; *The King* v. *Journeymen Taylors*, 8 Mod. 11; *The King* v. *De Berenger*, 3 M. & S. 67; *Rex* v. *Norris*, 2 Keny. 300; *The King* v. *Waddington*, 1 East 143, 167; Bish. Cr. L. (6th ed.) ss. 527,. 528; *Neustadt* v. *Hall*, 58 Ill. 172; *Edgar* v. *Fowler*, 3 East 222; *Atcheson* v. *Mallon*, 43 N. Y. 147; *Gulick* v. *Ward*, 10 N. J. Law 87; *Mills* v. *Mills*, 40 N. Y. 545; *Hannah* v. *Fife*, 27 Mich. 172; *Tool Company* v. *Norris*, 2 Wall. 45; *Horn* v. *Star Foundry Co.*, 23 W. Va. 522; *Collins* v. *Locke*, 4 L. R. App. Cas. 674; *Raymond* v. *Leavitt*, 46 Mich. 447; *Perkins* v. *Savage*, 15 Wend. 412; *Dixon* v. *Olmstead*, 9 Vt. 310; *Griswold* v. *Waddington*, 16 Johns. 439, 486; *Taylor* v. *Blair*, 3 T. R. 452; *Fales* v. *Mayberry*, 2 Gall. 560; *Hunt* v. *Knickerbacker*, 5 Johns. 327; *Hodgson* v. *Temple*, 5 Taunt. 181; *Ex-parte Daniels*, 14 Vesey 192; *Morck* v. *Abel*, 3 B. & P. 35; *Harrington* v. *The Victoria Graving Dock Co.*, L. R. 3 Q. B. D. 549; *Denver & N. O. R. R.* v. *Railroad*, 15 Fed. Rep. 650;

*Hartford & New Haven R. R. Co.* v. *Railroad*, 3 Robt. 411; *Hoffman* v. *Brooks*, 23 Am. L. Reg. (N. S.) 648; *Stanton* v. *Allen*, 5 Denio 434; *Arnot* v. *Coal Co.*, 68 N. Y. 558; *Salt Co.* v. *Guthrie*, 35 Ohio St. 666; *Craft* v. *McConoughy*, 79 Ill. 346; *Shrewsbury R'y Co.* v. *Railway*, 4 DeG. M. & G. 115; *Charlton* v. *Railway*, 5 Jur. (N. S.) 1097; *Midland R'y Co.* v. *Railway*, L. R. 2 Eq. 524; *Armstrong* v. *Toler*, 11 Wheat. 258; *Snell* v. *Dwight*, 120 Mass. 9; *Read* v. *Smith*, 60 Texas 379; *Everet* v. *Williams*, 2 Poth. Ob. 3, *n. a.*; *Wald's* Pol. Cont. 235; *Sykes* v. *Beadon*, L. R. 11 Ch. D. 170; *Jackson* v. *McLean*, 36 Fed. Rep. 213; *Gould* v. *Kendall*, 15 Neb. 549; *Kitchen* v. *Greenabaum*, 61 Mo. 110; *Watson* v. *Fletcher*, 7 Grat. 1; *Hanauer* v. *Woodruff*, 15 Wall. 439; *Northrup* v. *Phillips*, 99 Ill. 449; *Riley* v. *Jordan*, 122 Mass. 231; *Bartle* v. *Nutt*, 4 Peters 184; *Watson* v. *Murray*, 23 N. J. Eq. 257; *Gregory* v. *Wilson*, 36 N. J. Law 315; *Todd* v. *Rafferty*, 30 N. J. Eq. 254; *King* v. *Winants*, 71 N. C. 469; *Woodworth* v. *Bennett*, 43 N. Y. 273.]

[The case was also argued orally by *Charles H. Burns*, for the plaintiffs, and *William M. Chase*, for the defendants. *W. S. Ladd* and *Fletcher Ladd* filed a brief for the plaintiffs, discussing the authorities cited by the defendants upon oral argument, all of which are necessarily omitted.]

BLODGETT, J. This proceeding is a bill in equity for a discovery and an accounting of the defendants' dealings with the plaintiffs' railroad properties from December 1, 1856, to July 1, 1887, under various contracts and leases; for the delivery of certain books, records, and papers alleged to belong to the plaintiffs; for the return to them of rolling stock and equipments of the appraised value of $147,592, which went into the defendants' possession at the time they took the plaintiffs' road, and which they still retain; and for the determination and adjustment of the respective rights of the parties in and to certain lands, depots, and tracks, situate in Manchester.

In bar of the plaintiffs' right to a recovery the defendants file three special pleas, and as to the matters in the bill not covered by the pleas, they demur. The plaintiffs demur to the pleas.

The first plea avers that the contracts between the parties, under which the defendants went into and retained the possession and management of the plaintiffs' road for more than thirty years, "were wholly beyond the corporate power" of either party to make or to ratify, and that therefore the defendants should be hence dismissed with their costs and charges. In other words, not denying that they have received the full benefit of the performance of the contract by the plaintiffs, the defendants say that they should be permitted to retain the benefit and property so acquired, and be dismissed with costs, because they were not empowered by

their charter to perform what they promised the plaintiffs in return.

The demurrer to this plea is sustained.   The defence set up is so repugnant to the natural sense of justice, so contrary to good faith and fair dealing, and so opposed to the weight of modern authority, that it need only be said that in equity, at least, neither party to a transaction *ultra vires* simply is heard to allege its invalidity while retaining its fruits.   However the contractual power of the defendants may be limited under their charter, there is no limitation of their power to make restitution to the other party whose money or property they have obtained through an unauthorized contract; nor, as a corporation, are they exempted from the common obligation to do justice which binds individuals, for this duty rests upon all persons alike, whether natural or artificial.

The second plea avers, and the demurrer admits, that at the time of the making of the contracts between the parties, and of the dealings thereunder, their respective roads " were rival and competing railroads, by the competition of which the prices of transportation thereon were, and but for said supposed contracts, dealings, transactions, operations, and business would have continued to be, materially reduced, and said alleged contracts, dealings, transactions, and business were made and had for the purpose of destroying and preventing such competition, and did destroy and prevent it."

It will be noticed that there is no averment in the plea that the purpose of the contracts was to raise the prices of transportation above a reasonable standard, or that they did have this effect, or that the public were prejudiced by their operation in any manner; and the naked question presented then is, whether all contracts between rival railway corporations which prevent competition are necessarily contrary to public policy, and therefore *mala prohibita* and illegal in themselves.

To state this question is to answer it in the negative, because it is obvious that the answer depends upon circumstances.   While, without doubt, contracts which have a direct tendency to prevent a healthy competition are detrimental to the public and consequently against public policy, it is equally free from doubt that when such contracts prevent an unhealthy competition and yet furnish the public with adequate facilities at fixed and reasonable rates, they are beneficial and in accord with sound principles of public policy. /For the lessons of experience, as well as the deductions of reason, amply demonstrate that the public interest is not subserved by competition which reduces the rate of transportation below the standard of fair compensation ; and the theory which formerly obtained, that the public is benefited by unrestricted competition between railroads, has been so emphatically disproved by the results which have generally followed its adoption in practice, that the hope of any permanent relief from excessive rates through

the competition of a parallel or rival road may, as a rule, be justly characterized as illusory and fallacious./

Upon authority, also, arrangements and contracts between competing railroads, by which unrestrained competition is prevented, do not contravene public policy. *Hare* v. *Railway Co.*, 2 Johns. & H. 80, is directly in point. In that case a bill in chancery had been brought by a stockholder in the defendant company to annul an agreement between two railway companies to divide the profits of the traffic in fixed proportions; and it was admitted there, as it is here, that the purpose of the agreement was to prevent competition. In dismissing the bill, Vice-Chancellor *Wood* said, *p.* 103,— "With regard to the argument against the validity of the agreement, I may clear the ground of one objection by saying that I see nothing in the alleged injury to the public arising from the prevention of competition. . . . It is a mistaken notion that the public is benefited by pitting two railway companies against each other till one is ruined, the result being at last to raise the fares to the highest possible standard." So, also, in 1 Red. R. R., s. 146, 2, it is said,—"There is no principle of public policy which renders void a traffic arrangement between two lines of railway for the purpose of avoiding competition." And Mr. Morawetz says, in his admirable treatise on corporations,—"Public policy clearly does not demand that railroad companies operating competing lines shall engage in strife causing their financial ruin; and, so far as agreements among companies are designed to effect this result, their purpose is not injurious to the public, or illegal. Moreover, such agreements are positively beneficial to the public, so far as they prevent the fluctuation of rates and unjust discriminations among shippers, which invariably attend the unrestricted competition of rival companies. It is therefore impossible to support the proposition that all agreements among railroad companies which restrict competition are condemned by law. Some such agreements may be contrary to public policy, and unlawful; but if an agreement of this character is a reasonable business arrangement to protect the shareholders and creditors of the companies from loss, and does not cause unreasonably high charges or violate any duty which the companies owe to the public, it should be sustained and enforced by the courts." Mor. Corp. (2d ed.) s. 1131. In the same section, in speaking of contracts in restraint of trade (to which many of the authorities and much of the argument for the defendants relate), he says,—"Even if there were such a rule as has been claimed applicable to competition in trade, the principle and policy of the rule would not be applicable to traffic arrangements designed merely to prevent ruinous competition and 'wars' among railroad companies. The main objection which has been urged against combinations restraining competition in trade, namely, that such combinations tend to produce monopolies and cause extortion, has no application to combinations among railroad

companies, for railroad companies are prohibited by law to charge more than reasonable rates. It should be observed, also, that competition among railroad companies has not the same safeguards as competition in trade. Persons will ordinarily do business only when they think they see a fair chance of profit; and if press of competition renders a particular trade unprofitable, those engaged in that trade will suspend or reduce their operations, and apply their capital and labor to other uses, until a reasonable margin of profit has been reached. But the capital invested in the construction of a railroad cannot be withdrawn when competition renders the operation of the road unprofitable. A railroad is of no use except for railroad purposes, and if the operation of the road were stopped, the capital invested in its construction would be wholly lost. Hence it is for the interest of a railroad company to operate its road, though the earnings are barely sufficient to pay the operating expenses. The ownership of the road may pass from the shareholders to the bondholders, and be of no benefit to the latter; but the struggle for traffic will continue so long as the means of paying operating expenses can be raised. Unrestricted competition will thus render the competitive traffic wholly unremunerative, and will cause the ultimate bankruptcy of the companie, unless the portion of their traffic which is not the subject of competition, can be made to bear the entire burden of the interest and fixed charges."

The application of these principles to the plea under consideration is patent and decisive. The geographical location and relative resources of the two roads were such as to render it obvious that the plaintiffs could not reasonably hope successfully to compete with their more powerful rival. The alternatives presented, it may be safely assumed, were combination or ruinous competition. They accepted the former; and as the combination did not, so far as appears by the pleadings, raise the rate of transportation above the standard of fair compensation, or violate any duty that is owing to the public from roads which are non-competing, there is nothing averred in the plea which bars the right of the plaintiffs to an accounting with the defendants.

Numerous cases have been cited in behalf of the defendants in support of their proposition that the combination between the parties must be regarded as void at common law because against public policy. It is quite impossible, without extending this opinion beyond all reasonable limits, to go through and comment upon these cases in detail, as has been done in the last brief for the plaintiffs; but it is sufficient to say, in general terms, as is there said, that they are cases of contracts in restraint of mercantile business; or cases of contracts which attempt to derogate from the right of eminent domain inherent in the state; or cases where contracts between railroad companies were held contrary to public policy because one of the parties attempted to bind itself not to

perform duties incident to the legal character of common carriers or public servants; or cases where contracts between railroad companies were held contrary to public policy because one of the parties agreed not to build, or to cease to operate, a road which they were chartered to build or operate; or cases where contracts between railroad companies have been held illegal merely on the ground that they were *ultra vires:* in short, they do not establish a rule which fairly includes a case like the one at bar. The demurrer to the second plea is sustained.

The averment in the third plea is, "that during all the time from said December 1, 1856, until July 1, 1887, the roads of the plaintiffs and defendants each constituted a part of the different lines of route for public travel and transportation between cities and towns within and without this state, forming rival and competing lines of route between such points."

This plea is understood to be based upon the statute of July 5, 1867, entitled "An act to prevent railroad monopolies," and providing, among other things, that "two or more railroad corporations chartered by the legislature of this state, constituting the whole or parts of different lines of route for public travel and transportation between any two cities or towns, or between any city and town, either within or without this state, forming rival and competing lines of route between such points, shall not be allowed to consolidate such roads or lines; and neither of said lines, or any road or roads composing the same, shall be run or operated by any such rival and competing line, or any road or roads, portion thereof, under any business contract, lease, or other arrangement, but each and every railroad corporation so situated shall be run, managed, and operated separately by its own officers and agents, and be dependent for its support on its own earnings from its local and through business in connection with other roads, and the facilities and accommodations it shall afford the public for travel and transportation under fair and open competition, unless such lease, contract, or arrangement be first authorized by the legislature, and approved by the governor and council."

When this act was passed the contract in force between the parties, and under which the roads were then being operated, was that of December 27, 1860; and the claim of the defendants is, that whatever may be said with reference to the prior contracts and to the operation of the roads under them up to the time of the passage of the act of 1867, that act rendered the further execution of the contract of December 27 illegal, and prohibited it.

This point is well taken. Whatever may now be the sentiment of New Hampshire in respect to the operation of railroads since the results attendant upon consolidation have been sufficiently demonstrated to remove any intelligent fear of extortion in rates or deterioration of service, there can be no doubt that in 1867 its sentiment was in favor of independent and competing lines, and

that the purpose of the legislature was to make the act in question an effective instrumentality against the consolidation of competing roads through contracts or arrangements between them, by means of which competition is removed. *Currier* v. *Railroad*, 48 N. H. 321; *Fisher* v. *Railroad*, 50 N. H. 208. The act, of course, had no *ex post facto* application, and was, therefore, of no effect as to anything which had already been done by the parties under the contract of December 27, but it did prohibit them from further operating the roads under that contract (unreported opinion of *Bellows*, J., in *Currier* v. *Railroad*, Dec. Law term, 1871), and so far rendered it void as to deprive either party of the right of recovering expressly for its subsequent breach. Nevertheless, we do not think the defendants are entitled to retain the money or other property so acquired, and for which they have rendered no corresponding equivalent to the plaintiffs in return, but, on the contrary, we are of opinion that it is their duty to make equitable compensation and restitution, and that the duty may be enforced in this proceeding.

It is true that, in general, where parties are concerned in illegal agreements or other transactions, whether they are *mala prohibita* or *mala in se*, courts of equity do not interpose to grant relief; but this is so only when the parties stand upon equal footing, for the doctrine everywhere running through the books is, that relief will be granted when both parties are *in delicto*, provided they do not stand *in pari delicto*. See Sto. Eq. Jur. (12th ed.) *ss.* 298, 300. These parties do not so stand, for however guilty the plaintiffs may have been in permitting, or in concurring in, the illegal operation of their road by the defendants after the act of July 5, their guilt must fairly be regarded as far less in degree than that of their associate in the offence. And that the legislature regarded the defendants as the greater offenders is made plain by the fact that the only penalty prescribed by the act of July 5 for the violation of its provisions is imposed upon the road which operates another road, and not upon the road which is operated; for the reading of the second section is, that "In all cases where any road, its directors, officers, or agents, shall hereafter enforce, or attempt to enforce or exercise, any authority over any other road, situated as provided in said first section, or do any act in conflict with said first section, such officers or agents shall severally be subject to a fine or liability not exceeding five hundred dollars for each offence, to be recovered by action of debt, or by information or indictment, for the use of the county within which such suit shall be instituted."

These considerations, as well as others of a kindred character which need not be adverted to, bring the case fully within the exception to the general rule that equity does not grant relief to parties concerned in illegal transactions; and if this be so, it is the end of the case as regards the questions raised by the pleas, because, if the transactions between the parties were of the character

which the defendants now ascribe to them, the plaintiffs, not being *in pari delicto*, are entitled to participate in the property accumulated or its proceeds, which, as between the parties, will be divided according to equity.

There is, however, another ground of relief which should be briefly mentioned. The contracts have been executed on the part of the plaintiffs: they were not immoral, and they were illegal only so far as they were prohibited by statute. Taking this to be so, and regarding the parties as truly *in pari delicto*, the case still falls within the general rule, that "if an agreement is legally void and unenforceable by reason of some statutory or common-law prohibition, either party to the agreement who has received anything from the other party and has failed to perform the agreement on his part must account to the latter for what has been so received. Under these circumstances, the courts will grant relief irrespective of the invalid agreement, unless it involves some positive immorality, or there are other reasons of public policy why the courts should refuse to grant relief in the case." Mor. Corp., *s.* 721. He adds,—"These doctrines have been applied repeatedly in suits arising out of contracts entered into by corporations, although prohibited by statute or by the common law; and although the contracts were held illegal and unenforceable in these cases, a recovery was allowed to the extent of the consideration received,"—citing *White* v. *Franklin Bank*, 22 Pick. 181; *Dill* v. *Wareham*, 7 Met. 438; *Episcopal C. Society* v. *Episcopal Church*, 1 Pick. 372, 373; *Whitney* v. *Peay*, 24 Ark. 22; *Phila. Loan Co.* v. *Towner*, 13 Conn. 249; *Foulke* v. *Railroad*, 51 Cal. 365; *Farmers' Loan & Trust Co.* v. *Railroad*, 1 M'Crary 247; *Madison Ave. Baptist Church* v. *Baptist Church*, 73 N. Y. 82; *Tracy* v. *Talmage*, 14 N. Y. 162; *Sacketts Harbor Bank* v. *Codd*, 18 N. Y. 240; *Oneida Bank* v. *Bank*, 21 N. Y. 490, 496; *Vanatta* v. *State Bank*, 9 Ohio St. 27; *U. S. Express Co.* v. *Lucas*, 36 Ind. 361;—see, also, in addition, *Pratt* v. *Short*, 79 N. Y. 437, 445; *Owen* v. *Davis*, 1 Bail. 315; *Gilliam* v. *Brown*, 43 Miss. 641, 644; *W. U. Tel. Co.* v. *Railroad*, 1 M'Crary 558, 562; *Lewis* v. *Alexander*, 51 Tex. 578; *Brooks* v. *Martin*, 2 Wall. 70 and cases cited; *Planters' Bank* v. *Bank*, 16 Wall. 483 and cases cited; *Central Trust Co.* v. *Railroad*, 23 Fed. Rep. 306; *Parkersburg* v. *Brown*, 106 U. S. 487, 503.

The leading case of *Brooks* v. *Martin* was a bill in equity for an account of profits between the parties under an executed partnership contract for the purchase and location of soldiers' land warrants "confessedly against public policy" as well as in violation of the express provisions of an act of congress; but the court held, that the partner in whose hands the profits were could not refuse to account for or divide them on the ground of the illegal character of the original contract, saying (*Miller*, J.), *p.* 80,—"It is to have an account of these funds, and a division of these proceeds, that this bill is filed. Does it lie in the mouth of the partner,

who has by fraudulent means obtained possession and control of these funds, to refuse to do equity to his other partner, because of the wrong originally done or intended to the soldier? It is difficult to perceive how the statute, enacted for the benefit of the soldier, is to be rendered any more effective by leaving all this in the hands of Brooks, instead of requiring him to execute justice as between himself and his partner, or what rule of public morals will be weakened by compelling him to do so. . . . The transactions which were illegal have become accomplished facts, and cannot be affected by any action of the court in this case." We are aware that the doctrine of this case has been criticised, and perhaps denied, by some of the state courts, but it was reaffirmed in *Planters' Bank* v. *Bank, supra,* and it is not found to have been changed or modified in any subsequent decision.

It requires no words to apply the doctrine of *Brooks* v. *Martin* to the present case: it applies itself. Nor do we find that its application involves any immorality, or that it is forbidden by any other reasons of public policy. Doubtless a court of equity is not positively bound to interfere in cases of this description, and may exercise its discretion; but it is peculiarly the office of equity to do justice, and justice manifestly requires that the defendants should not keep any part of the plaintiffs' equitable share of the property they obtained from operating the plaintiffs' road, whether legally or illegally. Whatever the legislature may have intended to accomplish by the anti-monopoly act of 1867, there is no reason to suppose their intention was to reward the Concord Railroad for its violation. And however it may once have been, it is certainly now difficult to see how public policy is subserved by allowing the addition of a private wrong to a public wrong, which necessarily results when, without any equivalent in return, one party to an executed illegal transaction excludes the other from participating in the proceeds; and we entirely fail to appreciate the morality which denies in such cases any rights to the party whose money or other property has been thus appropriated by his associate, contrary to express agreement and every principle of fair dealing, and which in conscience the benefited party cannot retain. The demurrer to the third plea is also sustained.

Various causes of demurrer to the bill are assigned by the defendants, but at the argument only the one relating to discovery was insisted upon, or need be considered.

The bill prays " that the defendants be ordered to make a full, accurate, and true discovery and disclosure of all and singular the matters and things herein set forth." This is the usual prayer for a discovery, and no objection to its sufficiency is perceived. It is immaterial that the prayer concludes with a request that the " defendants be required, but not under oath, . . . to discover and state fully and with particularity " certain things specified; for if the word *answer,* which it is said was intended to be

used, is substituted for "discover," the first objection of the defendants, that a prayer for a discovery not under oath cannot be granted, is readily obviated.

The second objection, that the policy of the law exempts the defendants and their officials from discovery, is based wholly upon the unfounded assumption that the plaintiffs' action is against public policy, and has already been sufficiently considered.

The third and last objection is, that the fundamental law does not require the defendants to discover. The argument in its support is, that the defendants are charged with the doing of that which was positively prohibited by the act of July 5, 1867; that if the charge is sustained, each of the defendants is liable to the penalty prescribed by the act; and that they are asked to make discovery of facts which in any event would tend to fix their penal liability under that act, contrary to the constitutional provision that "no subject shall be compelled to furnish evidence against himself."

This objection is unavailing. See *Currier* v. *Railroad*, 48 N. H. 321. The defendants are not obliged to discover any matters that may expose them to the penalty of the act of 1867; and they cannot do so, however willing they may be, because prosecution under that act is barred by the statute of limitations. The transactions between the parties as to which discovery is sought ended July 1, 1887, and *s.* 10, *c.* 226, Gen. Laws, provides that "all prosecutions founded upon any penal statute, which are wholly or in part for the use of the prosecutor, shall be brought within one year; and all other suits and prosecutions thereon within two years after the commission of the offence, unless otherwise specially provided."

The defendants' demurrer is overruled.

*Case discharged.*

SMITH, J., did not sit: the others concurred.